**Sharon LAURIN, Plaintiff, Appellant,**

v.

**The PROVIDENCE HOSPITAL and Massachusetts Nurses Association, Defendants, Appellees.**

**No. 98–1020.**

United States Court of Appeals, First Circuit.

Heard May 7, 1998.

Decided July 28, 1998.

Tani E. Sapirstein, with whom Charles A. Lynch III and Sapirstein & Sapirstein, P.C. were on brief for appellant.

Maurice M. Cahillane, with whom Egan, Flanagan & Cohen was on brief for appellee Providence Hospital.

Jack J. Canzoneri, with whom McDonald & Associates was on brief for appellee Massachusetts Nurses Association.

Before SELYA, Circuit Judge, CAMPBELL and CYR, Senior Circuit Judges.

CYR, Senior Circuit Judge.

Plaintiff Sharon Laurin, a registered nurse who was discharged from her employment, challenges a summary judgment ruling which dismissed her claims for relief under the Americans With Disabilities Act, *see* 42 U.S.C. §§ 12112(a) ("ADA"), its state-law counterpart, Mass. Gen. Laws ch. 151B, § 4(16) ("Chapter 151B"), and the collective bargaining agreement ("CBA") between her former employer and her union. We affirm the district court judgment.

## I

## BACKGROUND

From 1989 until August 1995, Laurin worked as a staff nurse in the 24–hour maternity unit at The Providence Hospital ("Hospital"). Staff nurses principally worked one of three shifts: days (7:00 a.m.—3:30 p.m.), evenings (3:00 p.m.—11:30 p.m.), or nights (11:15 p.m.—7:15 a.m.). In order to cover the less desirable evening and night shifts, the Hospital required all non-senior day nurses to work approximately one-third of their scheduled hours either on the evening or the night shift. Laurin worked this so-called "days rotating" position throughout her tenure.

In 1993, Laurin returned to graduate school on a part-time basis after receiving permission from her supervisor to reduce her work week from 40 to 32 hours. During the

1995 spring semester, her supervisor authorized a further, temporary reduction from 32 hours to 24, which enabled Laurin to retain the benefits commensurate with a 32–hour position. The Hospital posted neither of these part-time nursing positions before offering them to Laurin. Notwithstanding her reduced work schedule, Laurin continued to rotate shifts.

After completing the night shift on April 26, 1995, Laurin blacked out at the wheel while driving home. Her primary-care physician, as well as a neurologist, diagnosed the event as syncope, or fainting. The neurologist concluded that Laurin should refrain from "long periods without sleep" and keep to a "regular schedule of work hours," or "one [consistent] shift." He added that a regular daytime shift would be "most beneficial" since Laurin had small children who were primarily in need of her attention during daytime hours.

Laurin presented the neurologist's report to her immediate supervisors, and requested permanent reassignment to a days-only position in the maternity unit. According to Laurin, her supervisors initially observed, "in a laughing manner," that "they probably weren't going to be able to accept this note" because other days-rotating nurses with small children inevitably would beg off their shift-rotation assignments as well. Laurin then contacted a representative from the Massachusetts Nurses Association ("MNA"), the union representing staff nurses at the Hospital. At a meeting attended by the MNA representative, Laurin was advised by her supervisors that "they would check into it [viz., the requested accommodation]."

Meanwhile, the MNA polled the staff nurses in the maternity unit, the majority of whom objected to a days-only position for Laurin and refused to volunteer to cover her evening and night shifts.

On May 24, 1995, the Hospital's human resources department sent a letter advising that shift rotation was an "essential function" of Laurin's position, mandated by the CBA between the Hospital and the MNA.[1] Nevertheless, as a temporary accommodation the Hospital proposed to assign Laurin to a days-only schedule for six weeks, during which time she was to consult with human resources personnel about any alternative days-only job positions (e.g., operating room) available at the Hospital. Notwithstanding her refusal to sign the proposal letter due to its characterization of her medical condition as a "lifestyle problem," the Hospital nonetheless granted Laurin a temporary days-only assignment for the six-week period.

On the early morning of June 17, 1995, Laurin suffered a seizure while at home sleeping. Her neurologist responded with a report to the Hospital, adjusting his diagnosis from syncope to seizure disorder. Concluding that the seizure had been induced by fatigue, the neurologist opined that "a daytime position is absolutely necessary." The Hospital nevertheless refused to reconsider its earlier decision to deny Laurin a days-only position, but did agree to extend the temporary accommodation until August 7, when she was scheduled to resume work on the evening shift. Once again Laurin contacted the MNA.

1. CBA § 4.05, captioned "Shift Rotation," provides in pertinent part:
   Effective on the signing of this [Contract]:
   A. At the time of employment, a days rotating nurse may indicate in writing a preference for day/evening or day/night rotation. The request may be granted on the basis of staffing demands.
   B. No days rotating nurse who has completed 52,000 hours of seniority [viz., 25 years] shall be required to rotate from his/her shift except on a volunteer basis.
   C. No days rotating nurse who has completed 41,600 hours of employment [viz., 20 years] as a registered nurse shall be required to rotate more than 13 times per quarter.
   D. No days rotating nurse who has completed 31,200 hours of employment [viz., 15 years] shall be required to rotate more than 13 times per quarter.
   E. The Hospital shall endeavor to decrease the amount of shift rotation that nurses currently experience.
   F. When nurses rotate to and from the 11:15 p.m.—7:15 a.m. shift they shall be granted a sleep day without pay (or use vacation/holiday or personal time) as a sleep day in addition to their regular day(s) off if the nurse so requests prior to time schedules being posted.

Upon reviewing her complaint the MNA declined to submit a grievance, on the grounds that the Hospital had not violated the CBA, other staff nurses could not be compelled to cover Laurin's evening and night shifts, and the MNA would not support an individual member's complaint to the detriment of its other members. Instead, the MNA recommended that Laurin consider obtaining an unpaid medical leave of absence, working straight-evening shifts, or rotating day-evening shifts (*i.e.*, no nights).

After Laurin refused, the MNA informed her in writing that she had the right to pursue a grievance, and outlined the procedures. On August 4, Laurin filed a Step 1 grievance with the Hospital. Notwithstanding repeated warnings that she would be terminated, Laurin failed to appear for work on the evening of August 7.

Following her termination, Laurin reiterated her request that the MNA file a grievance in her behalf. The MNA again refused. In August 1995, Laurin filed her own Step 1 and Step 2 grievances, which were denied by the Hospital following a hearing. After Laurin filed a Step 3 grievance based on substantially similar allegations, the Hospital declined to respond. For its part, the MNA informed Laurin that it would not assist in presenting her grievances to arbitration.

Laurin filed the present action in federal district court in January 1996. The six-count complaint alleged that by refusing to assign her to a days-only schedule on a permanent basis the Hospital had violated the ADA and its state counterpart, Chapter 151B, and breached the CBA; and, further, that by refusing to file grievances and to pursue arbitration in her behalf the MNA had violated the ADA and Chapter 151B, and breached its duty of fair representation. After the defendants successfully moved for summary judgment on all counts, Laurin appealed.

**2.** Summary judgment rulings are subject to *de novo* review and all contested facts are to be viewed in the light most favorable to the nonmovant in determining whether trial-worthy issues exist or the movant was entitled to judgment as a matter of law. *See EEOC v. Amego, Inc.*, 110 F.3d 135, 141 (1st Cir.1997).

## II

### DISCUSSION

**A. The ADA and the Chapter 151B Claims Against the Hospital**

■ Laurin first contends that the Hospital was not entitled to summary judgment on the ADA and Chapter 151B claims because the issue as to whether shift rotation was an "essential function" of her former position presented a quintessential question of fact for the jury.[2] An ADA claimant alleging handicap discrimination must prove by a preponderance of the evidence that: (1) she was "disabled" within the meaning of the ADA; (2) she was a "qualified individual," *i.e.*, that either with or without reasonable accommodation she was able to perform the "essential functions" of her former position; and (3) her discharge was due, in whole or in part, to her disability. *See EEOC v. Amego, Inc.*, 110 F.3d 135, 141 n. 2 (1st Cir.1997); *Katz v. City Metal Co.*, 87 F.3d 26, 30 (1st Cir.1996).

■ It is well settled that an employer need not accommodate a disability by foregoing an "essential function" of the employment position. *See, e.g., Miller v. Illinois Dep't of Corrections*, 107 F.3d 483, 484 (7th Cir.1997) ("Under the ADA, the employer avoids all liability if the plaintiff would have been fired because incapable of performing the essential functions of the job...."); *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 140 (2d Cir.1995) (similar); H.R.Rep. No. 101–485(II), at 73 (1990); *accord Scheer v. City of Cedar Rapids*, 956 F.Supp. 1496, 1502 (N.D.Iowa 1997) ("[T]he request to perform only some of the essential functions of a job is not a request for reasonable accommodation.").[3] EEOC interpretive regulations afford guidance in assessing whether a particular job requirement is an "essential function" for purposes of the ADA:

(1) In general. The term essential functions means the fundamental job duties of the employment position the individ-

**3.** We assume *arguendo* that Laurin adduced evidence from which a rational jury could have found that her seizure disorder, or epilepsy, constituted a "disability" under the ADA. *See* 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g).

ual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.

(2) A job function may be considered essential for any of several reasons, including but not limited to the following:

(i) The function may be essential because the reason the position exists is to perform that function;

(ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

(3) Evidence of whether a particular function is essential includes, but is not limited to:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n); *see Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 672 (1st Cir.1995) (noting that EEOC regulations interpreting the ADA, while not controlling, constitute " 'a body of experience and informed judgment to which courts ... may properly resort for guidance' ") (citation omitted); *see also* 42 U.S.C. § 12111(8).

■ The initial salvo by Laurin is aimed at what she considers the inappropriately high level of deference the district court accorded the Hospital's determination, pursuant to 29 C.F.R. § 1630.2(n)(3)(i), that shift-rotation is an essential function. Such deference is not appropriate, Laurin says, because she had adduced *direct evidence* of the Hospital's discriminatory attitude toward her particular handicap. *Cf. Amego,* 110 F.3d at 145 (endorsing considerable deference to employer's judgment as to "essential function" "[w]here the plaintiff has presented *no evidence* of discriminatory intent, animus, or even pretext") (emphasis added). Specifically, Laurin contends that the Hospital and her supervisors responded to her requests for accommodation with "incredulous refusal[s]," declined to take them "seriously," and belittled her medical condition as a mere "lifestyle problem." On the contrary, close inspection of Laurin's record citations, even viewed in their most favorable light, belie her contention.

Assuming *arguendo* that Laurin plausibly interprets *Amego,* the only concrete allegation among the lot is that her direct supervisors (*viz.,* Claire Margosiak and the director of nursing, Joan Richter) reacted in a "laughing manner" to her initial request for accommodation. Even assuming as much, Laurin's claim is nonetheless flawed, since she was not diagnosed as having a seizure disorder until later, after experiencing her second episode. Such spontaneous remarks, made long before the supervisors had an opportunity adequately to assess the merits of the requested accommodation, could be considered only marginally probative of any discriminatory animus on their part.

Furthermore, the supervisors explained to Laurin that the shift-rotation requirement would be rendered obsolete were the Hospital to waive it for all staff nurses with small children who might experience episodes of fatigue. Nor was their characterization of Laurin's medical condition—as a "lifestyle problem"—particularly surprising or remarkable, let alone suspect, given that her own neurologist had opined that Laurin's medical condition likely had been induced by the fatigue associated with her frenetic daily activities—childcare, work, and school. Viewed in context, therefore, the supervisors' observations rationally cannot be considered ex-

pressions of animus towards persons afflicted with Laurin's medical condition.

Even assuming that a rational factfinder could draw so tenuous an inference, however, Laurin failed to adduce competent evidence that her immediate supervisors played a meaningful role in the subsequent Hospital decision to deny the requested accommodation and discharge her. Instead, as Laurin concedes, the supervisors advised her that "they would check into it," thus strongly suggesting that any final decision must be made at a higher level. Nor is it surprising in the least that the decision would be made by higher-ups, given that any decision to waive the shift-rotation requirement for the first time in Hospital history plainly would implicate important institutional considerations. *Cf. Santiago v. Canon U.S.A., Inc.,* 138 F.3d 1, 6 n. 8 (1st Cir.1998) (noting that " 'stray remarks in the workplace . . ., statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself' " normally are insufficient to establish discriminatory animus) (citation omitted); *Lehman v. Prudential Ins. Co. of Am.,* 74 F.3d 323, 329 (1st Cir.1996) ("Isolated, ambiguous remarks are insufficient, by themselves, to prove discriminatory intent."). Consequently, the letter rejecting Laurin's request for accommodation—and instead proposing a temporary six-week accommodation—came from David Tatro, the director of the Hospital's human resources department, not from Laurin's supervisors. It is noteworthy as well that the Tatro letter in no way indicated what, if any, role either Richter or Margosiak played in the Hospital decision not to "waive" its longstanding, consistently-enforced shift-rotation policy. *See also* Letter from Margosiak to plaintiff (7/6/95) ("I heard from Human Resources today . . . [that] the decision has been made to extend your temporary [accommodation] . . . ."). Accordingly, Laurin's suppositional "direct" evidence of discriminatory animus came up well short of its target.

Absent *direct* evidence that the Hospital harbored a discriminatory animus in maintaining that shift-rotation was an "essential [job] function," Laurin had no option but to resort to the familiar *McDonnell–Douglas* burden-shifting paradigm to establish a circumstantial case. *See Jacques v. Clean–Up Group, Inc.,* 96 F.3d 506, 511 (1st Cir.1996); *see also Snow v. Ridgeview Med. Ctr.,* 128 F.3d 1201, 1206 (8th Cir.1997). Thus, initially Laurin was required to demonstrate a prima facie case on all three essential elements of her claim, *see supra:* (1) "disability," (2) "qualification," and (3) causation. *See Amego,* 110 F.3d at 141. Only at that point would the Hospital be required to articulate a nondiscriminatory reason for its adverse employment actions. *See Jacques,* 96 F.3d at 511:

> This entails only a burden of *production,* not a burden of *persuasion;* the task of proving discrimination remains the plaintiff's at all times. Once such a reason emerges, the inference raised by the prima facie case dissolves, and the plaintiff is required to show, unaided by the original inference of discrimination, that the employer's proffered reason is a pretext for discrimination . . . . [Plaintiff] must muster proof that enables a factfinder rationally to conclude that the stated reason behind the adverse employment decision is not only a sham, but a sham intended to cover up the proscribed type of discrimination.

*Dichner v. Liberty Travel,* 141 F.3d 24, 30 (1st Cir.1998) (emphasis added) (citations omitted); *see Snow,* 128 F.3d at 1206 ("The ultimate burden of proving unlawful discrimination always rests with the plaintiff."); *Miller,* 107 F.3d at 484 ("[T]he burden of proof on the [essential-function] issue is not on the employer but on the plaintiff.").[4]

Laurin vainly string-cites cases which acknowledge that the § 1630.2(n)(3) "essential function" inquiry tends to be fact-intensive, such that it is relatively rare that a trial

---

4. At present there is some question whether a Chapter 151B claimant—unlike an ADA claimant—may satisfy her burden of proof merely by showing that the defendant articulated a pretextual reason for the challenged employment action. *See Dichner,* 141 F.3d at 30–31 & n. 7 (noting that an ADA plaintiff must prove more than pretext). Whatever the current state of Massachusetts law, however, we conclude that Laurin likewise failed to satisfy the lesser "pretext-only" standard, *see infra.* Accordingly, we confine the ensuing analysis to her ADA claim.

court may enter summary judgment. *See, e.g., Barber v. Nabors Drilling U.S.A., Inc.,* 130 F.3d 702, 707 (5th Cir.1997). Nevertheless, since an ADA plaintiff ultimately must shoulder the burden of establishing that she was able to perform all "essential functions" of her position, at summary judgment Laurin—and not the Hospital—bore the burden of adducing competent evidence from which a rational factfinder could have found in her favor, *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See, e.g., Martinson v. Kinney Shoe Corp.,* 104 F.3d 683, 686–87 (4th Cir.1997) (resolving "essential function" issue in employer's favor at summary judgment); *Amego,* 110 F.3d at 147 (citing *Martinson* with approval); *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1124 (10th Cir.1995) ("Although ordinarily a fact question to be decided on a case-by-case basis, plaintiffs have presented no evidence to rebut the [employer's] conclusion that speed is essential to the [plaintiffs'] selector job.") (citation omitted). Nor could Laurin satisfy her rebuttal burden under Rule 56 by relying upon " 'conclusory allegations, improbable inferences, and unsupported speculation.' " *Woods v. Friction Materials, Inc.,* 30 F.3d 255, 259 (1st Cir.1994) (citation omitted).

■ Even assuming *arguendo* that Laurin adduced sufficient evidence for a prima facie case of "qualification," the Hospital in turn met its burden by *articulating* a nondiscriminatory reason for denying the request for accommodation. Indeed, all the competent evidence relating to the seven nonexclusive factors identified in 29 C.F.R. § 1630.2(n)(3) weighed overwhelmingly in favor of the Hospital.[5] Hospital witnesses uniformly attested that since the evening and night shifts were less desirable than the day shift, it was essential that the Hospital cover the shortage of "straight-evening" and "straight-night" nurses by making shift-rotation an "essential function" of all non-senior daytime nursing positions in its 24–hour maternity unit. Thus, the Hospital has *always* required *all* non-senior staff nurses to rotate shifts, and it has *never* made an exception. *See Milton,* 53 F.3d at 1124 ("The initial inquiry in determining ['essential function'] is whether an employer actually requires all employees in the position to perform the allegedly essential function.").

Perhaps most importantly, a 24–hour hospital unit imposes exceptional nurse-scheduling demands upon the hospital-employer. For example, since maternity-room patients need nursing services twenty-four hours a day, normally it will not be possible for the hospital-employer to allow its maternity nurses to work only the more desirable or convenient shifts, where to do so would jeopardize its ability to staff its maternity unit during the less desirable evening and night shifts.[6] Medical needs and emergencies—many potentially life-threatening—do not mind the clock, let alone staff-nurse convenience.

At least in the instant context, to suggest otherwise would be tantamount to maintaining that night work is not an "essential function" of a night watchman's job, even though that is the only time the premises are not otherwise occupied. *Cf., e.g., Martinson,* 104 F.3d at 687 (noting that provision of store security is of such a nature that it "cannot reasonably be abandoned for even 'a brief

---

**5.** Laurin asserts but two rejoinders. First, unlike her job posting, her written job description did not specify shift-rotation as a job function. Nevertheless, it did provide that the employee must "meet[] hospital *attendance* and punctuality *requirements to ensure proper coverage.*" (Emphasis added.) Because Laurin had the ultimate burden of proving "qualification," however, she needed to adduce affirmative evidence that the job description somehow ruled out shift-rotation as an essential function. Second, Laurin notes that the § 1630.2(n)(3) criteria are expressly made nonexclusive. *See Stone v. City of Mount Vernon,* 118 F.3d 92, 97 (2d Cir.1997). Nevertheless, she has not identified any relevant factor

not listed in § 1630.2(n)(3) which would cut in her favor, *see infra.*

**6.** We have held that the phrase "essential function" is to be defined broadly, and that it may be more encompassing than such core job requirements as an employee's technical skills and experience, *see, e.g., Grenier,* 70 F.3d at 674–75, even including such individual or idiosyncratic characteristics as scheduling flexibility, *cf. Jasany v. United States Postal Serv.,* 755 F.2d 1244, 1251 (6th Cir.1985) (defining scheduling flexibility as an essential function under analogous Rehabilitation Act); *Mackie v. Runyon,* 804 F.Supp. 1508, 1511 (M.D.Fla.1992) (same).

period'"); *Salmon v. Dade County Sch. Bd.,* 4 F.Supp.2d 1157, 1162–63 (S.D.Fla.1998) ("Unlike other jobs that can be . . . deferred until a later day, a guidance counselor must counsel students at the school during the hours in which the children are in attendance."). The 24–hour hospital unit setting thus affords a particularly compelling context in which to defer to rational staffing judgments by hospital employers based on the genuine necessities of the hospital business. *See* 42 U.S.C. § 12112(b)(6) (defining term "discriminate" to include the use of "qualification standards . . . [in]consistent with *business necessity* ") (emphasis added).

Section 4.05 of the CBA likewise supported the Hospital's judgment that shift rotation is an "essential function" of a daynurse position in its maternity unit. *See supra* note 1. By specifying but one criterion which excuses day nurses from shift rotation—namely, the prescribed levels of seniority—the CBA plainly implied that other criteria did not warrant waivers of the shift-rotation requirement, *see, e.g., Institut Pasteur v. Cambridge Biotech Corp.,* 104 F.3d 489, 495 (1st Cir.) (" '[T]he doctrine of *expressio unius est exclusio alterius* instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded.' ") (citation omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 2511, 138 L.Ed.2d 1014 (1997), and for good reason. Were the Hospital to waive the shift-rotation requirement for Laurin, either other non-senior nurses or senior nurses would have to be called upon to cover Laurin's evening and night shifts, which at the very least would violate the Hospital's commitment under CBA § 4.05(E) to reduce the rotation obligations of its nurses, *see Foreman v. Babcock & Wilcox Co.,* 117 F.3d 800, 810 (5th Cir. 1997) ("[T]he ADA does not require an employer to take action inconsistent with the contractual rights of other workers under a [CBA]."); *cert. denied,* —— U.S. ——, 118 S.Ct. 1050, 140 L.Ed.2d 113 (1998); *accord Shea v. Tisch,* 870 F.2d 786, 789–90 (1st Cir.1989) (same, under analogous provisions of Rehabilitation Act), or else the Hospital would have to try to hire new nurses to cover the less desirable off-shifts. *See, e.g., Turco v. Hoechst Celanese Corp.,* 101 F.3d 1090,

1094 (5th Cir.1996) (noting that employer "has no straight day-shift chemical operator positions—all operator positions are on rotating shifts [—so that] [m]oving one operator to a straight day shift would place a heavier burden on the rest of the operators in the plant"); *Milton,* 53 F.3d at 1125 ("An accommodation that would result in other employees having to work harder or longer hours is not required."); *Krennerich v. Inhabitants of Town of Bristol,* 943 F.Supp. 1345, 1351 (D.Me.1996) (noting that ADA does not require employers " 'to assign existing employees or hire new employees' " to perform abandoned "essential functions" of plaintiff's job position) (quoting *Gilbert v. Frank,* 949 F.2d 637, 644 (2d Cir.1991)).

■ Laurin attempts to demonstrate triable factual issues on other fronts as well. First, she cites evidence that the Hospital had accommodated her in the past by allowing her to work less than full-time hours while she pursued her education, and that the Hospital probably violated the CBA by offering her those "new" part-time positions without posting them in advance. Be that as it may, we fail to see how such evidence is relevant to whether or not *shift-rotation* is an "essential function." Instead, at most it tends to show that *full-time status* may not have been an "essential function" of Laurin's staff-nurse position, which is not the subject matter of CBA § 4.05. Moreover, Laurin acknowledges that the Hospital continued to insist that she rotate shifts even after 1993, when she assumed less-than-full-time status.

■ Second, we reject Laurin's claim that the temporary eight-week accommodation, during which the Hospital allowed her to work the straight-day shift, undercuts the Hospital's contention that it could not cover all three shifts without the shift-rotation requirement. From a labor-management policy standpoint, it would be perverse to *discourage* employers from accommodating employees with a temporary breathing space during which to seek another position with the employer. Here, the Hospital actively counseled Laurin in a *bona fide* attempt to locate a non-rotating position within the Hospital. An employer

does not concede that a job function is "non-essential" simply by voluntarily assuming the limited burden associated with a temporary accommodation, nor thereby acknowledge that the burden associated with a permanent accommodation would not be unduly onerous. *See Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir.1996) (employer's temporary creation of a "new" position for ADA plaintiff is irrelevant to "essential function" inquiry).

▪ Third, Laurin maintains that the deposition testimony of her supervisor, Claire Margosiak, gave rise to a trial-worthy issue. Margosiak explained that in her experience it had been easier to find applicants willing to work straight-evening shifts than days-rotating. As Laurin views it, this testimony undermined the contention that the Hospital could not cover evening shifts without rotating day nurses to the evening shift. We disagree.

To repeat, Laurin—and not the Hospital—bore the burden of proof on the "essential function" element. *See Dichner*, 141 F.3d at 30. Once the Hospital articulated a legitimate reason for insisting upon shift-rotation as an "essential function"—*i.e.*, that it could not attract enough nurses to work the off-shifts—Laurin had to adduce specific evidence to debunk the Hospital's rationale; in other words, to support a reasonable inference that the articulated rationale was pretextual. *See Martinson*, 104 F.3d at 687 (noting that once "[defense witnesses] repeatedly testified that maintaining store security was an essential function ... [,] [plaintiff] offered no evidence to the contrary").

Absent further context the Margosiak testimony fell well short of the mark. For instance, absent evidence as to how many day nurses had enough seniority to be entitled to relief from shift-rotation, it is impossible to infer from the Margosiak comparison that the Hospital had enough evening nurses to cover all shifts. The Margosiak comparison—that it might be easier to fill straight-evening shifts *than day positions*—would not necessarily prove that the Hospital currently was able to employ all the evening nurses *it needed*, and without such proof Laurin could not establish that the Hospital did not need to tap its non-senior day nurses to fill the void. *See* 29 C.F.R. § 1630.2(n)(2)(ii) (job function may be "essential" because of the limited number of employees available to assume a necessary function).[7]

## B. The "Duty of Fair Representation" Claim Against MNA

▪ Finally, Laurin contends that the MNA breached its duty of fair representation by refusing to pursue her grievances against the Hospital. *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *see Williams v. Sea–Land Corp.*, 844 F.2d 17, 19 (1st Cir.1988). She asserted a so-called "hybrid" claim, which required that she prove that (1) the Hospital breached the CBA, thereby violating National Labor Relations Act § 301, *and* (2) the MNA breached its duty of fair representation by not championing her claims against the Hospital for allegedly breaching the CBA.[8] Failure to establish either prong is fatal to her "hybrid" claim. *See DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 164–65, 103 S.Ct.

7. Additionally, Laurin cites evidence that Mercy Hospital, another facility embraced within the Sisters of Providence Health System, had a CBA provision wherein it promised to use its best efforts to accommodate an employee with a disability. We need not linger over this claim, as Laurin first raised it in a postjudgment motion. The district court expressed legitimate concern that Laurin had not satisfied the threshold requirement of proving that the Mercy Hospital CBA was "newly discovered" evidence—or in other words, that Laurin could not have obtained the CBA prior to judgment in the exercise of due diligence. In all events we fail to see how the terms of a CBA separately negotiated with a different hospital sheds meaningful light on the

CBA negotiated by the Hospital. Nor did the vaguely worded CBA provision commit Mercy Hospital to accommodate employees by eliminating "essential functions" of their positions. Thus, we find no abuse of discretion in the district court's denial of Laurin's Rule 59(e) motion. *See Minh Tu v. Mutual Life Ins. Co.*, 136 F.3d 77, 82 (1st Cir.1998).

8. Laurin has not appealed the district court ruling dismissing her ADA and Chapter 151B handicap-discrimination claims against the MNA due to her failure to exhaust administrative remedies before the EEOC and the Massachusetts Commission Against Discrimination.

2281, 76 L.Ed.2d 476 (1983); *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570–71, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *DiPinto v. Sperling*, 9 F.3d 2, 4 (1st Cir. 1993); *Kissinger v. United States Postal Serv.*, 801 F.2d 551, 553 (1st Cir.1986).

Laurin did not carry her burden on the first prong. *See Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548. While CBA § 12.01 ordained that the Hospital not discriminate against employees with disabilities, Laurin failed to adduce evidence that the asserted reason for her discharge (*i.e.*, "essential function") was pretextual, or that the requested accommodation was denied due to any discriminatory animus. *See supra* Section II.A. Thus, absent the requisite showing that the grievance against the Hospital was meritorious, the MNA had no corresponding duty to pursue the grievance. The "hybrid" claim accordingly failed.

*Affirmed.*