LYNCH, Circuit Judge.
On December 6, 1996, Fred Calef was involved in an altercation at work at the Gillette Company which left his supervisor and co-workers fearing for them safety. Calef, who previously had received warnings following such incidents, was fired from his job at Gillette as a result. Calef brought suit alleging that Gillette violated Title I of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12111-12117 (2000), by terminating his employment, failing to reasonably accommodate him, and harassing him. He also brought a pendent state claim alleging his discharge was in violation of public policy.
The district court entered summary judgment against Calef and dismissed both his federal and state claims. We affirm on two grounds: Calef failed, within the summary judgment standard, to show that he was disabled, or that he was an otherwise qualified individual.
I.
We review the facts in this appeal from summary judgment in the light most favorable to Calef and take all inferences in his favor. Rivas Rosado v. Radio Shack, Inc., 312 F.3d 532, 535 (1st Cir.2002).
Calef worked as a Production Mechanic at Gillette from August 22, 1989 to December 13, 1996. In the early 1990s Calef had several incidents with co-employees which led his supervisors to make written reports. In 1990 he “had words” with a coworker. On April 4, 1991 Calef and a coworker each received a warning after an altercation in which Calef, in anger, had threatened the co-worker with physical harm after being so threatened himself. On March 10, 1992, Calef and another employee had to be physically separated by a supervisor after an incident in which the employees angrily exchanged insults and profanity and squirted oil on each other; Calef says the other employee squirted first. Six days later Calef was involved in another argument with a group leader. That night Calef got in a heated exchange with a different group leader and questioned the group leader’s performance.
As a result of this series of confrontations with his supervisors and co-workers — on April 4, 1991, March 10, 1992, and March 16, 1992 — Gillette gave Calef a written warning, which, inter alia, said Ca-lef was
being told that actions of this nature will not be tolerated and any such actions in the future could result in a final warning which could ultimately lead to his termination from the payroll.
On September 13, 1995, Calef was involved in another incident, which resulted in his being issued a Final Warning. On that day, Calef had a confrontation with Jeanette St. Aubin, a machine operator who worked with him on the second shift. It was Calef s responsibility to investigate and repair the machines that St. Aubin operated when she reported trouble with them, as she did that day. After her *78 encounter with Calef, St. Aubin, crying and shaking, went to see supervisor Frank Sciarini in his office. She said Calef had harassed her about her inability to run machinery and that whenever she had difficulties with her machine, Calef got mad at her and told her to speak English. St. Aubin further reported that Calef had come to her machine, pointed his finger in her face, raised his hand, made a fist, and stated, “Stop calling me or I’ll punch you in the face.” Calef admits raising his voice toward St. Aubin and he admits that he threatened to hit her. At the time, St. Aubin was two weeks shy of her sixtieth birthday. Calef says St. Aubin poked him in the chest and scratched his hand. He then threatened to hit her but immediately apologized and said he did not mean it. Calef admitted he “displayed irrational behavior in the incident.”
Calefs Final Warning, dated September 15, 1995, was issued “for a display of conduct that [was] detrimental to the interest of the Company.” It explicitly warned Calef “that any single infraction of [Company] policy in the future will result in his termination from the payroll.” Calef reviewed and signed the Final Warning without objection.
Pursuant to the written Final Warning, Gillette referred Calef to the Employee Assistance Program (EAP). In lieu of EAP counseling, he started therapy with Janis M. Soma in September 1995. Soma holds a Ph.D. but is not a medical doctor; we refer to her as “Dr. Soma.” They first met on September 19, 1995. Dr. Soma diagnosed Calef as having Attention Deficit Hyperactivity Disorder (ADHD). At her recommendation, Calef received counseling and obtained a prescription for Ritalin. Dr. Soma’s notes indicate that Calef had conflicts with others both at work and outside of work. After the initial meeting with Dr. Soma, for example, Calef had an incident outside of work. Despite the counseling and medication, his problems with threatening others continued.
Calef says he began taking Ritalin in the fall of 1995 and took it in 1996. At his deposition, Calef testified that Ritalin “really helped” the symptoms of his ADHD. Specifically:
It cleared my everyday function, I was doing things without thinking about them, about completing tasks, inore focused, more — it was like walking out of a fog and clearing everything up. With ADD I have to analyze a lot of things, and it’s the turmoil of weighing things and balancing things before I actually do something typically, and with Ritalin it was clearing of — very clear and' — everything was very clear.
His symptoms of ADHD disappeared or significantly diminished after he started taking Ritalin. Calef testified:
Q: While you were working at Gillette, while you were on the job, during this period that you took Ritalin, OK, namely all of ’96 when you were on the job, OK, did you have any effects of ADD while you were working or did the Ritalin control it?
A: I’m sure Ritalin helped control most of it. Most all of it. I can’t think of any that it didn’t. Job performances were good.
On the specific question of his ability to manage his anger, Calef testified that his ADHD did not cause him to become angry. Dr. Soma’s testimony agrees. She added that people with ADHD deal with anger more impulsively. Further, in highly stressful situations, people with ADHD may not focus as well as others do.
In early 1996, Calef told a nurse in Gillette’s Medical Department, Cynthia Ross, that he had ADHD. He also told *79 Joan Pemberton, the head of the Medical Department. Both nurses say that Calef was adamant they not disclose to others the fact that he had ADHD and they did not disclose it.[1] There is a dispute about whether Calefs supervisors ever learned from the nurses or from another source that Calef had ADHD. We will infer in Calefs favor that Gillette had such notice.
In March 1996, Dr. Soma gave Calef a medical certificate to support his request for leaves under the Family and Medical Leave Act (FMLA). Calef was given over 40 days of FMLA leave between May and December of that year. In this sense, Calef requested and was given a reasonable accommodation. There was, though, evidence that Sciarini, the supervisor, did not like Calef taking FMLA days off.
Calef says he had been assigned to work on updated versions of the machines that he had serviced earlier and he found the new setting stressful. On May 24, 1996, Dr. Soma addressed a note to the Gillette Medical Department saying she had advised Calef it would be in his best interests to reduce his stressors at work. In particular, she asked if there was a means to reverse his reassignment at work. The letter did not refer to either ADHD or a request for a reasonable accommodation. In Calefs favor we will infer that this letter was adequate to request a reasonable accommodation. Gillette declined to change his assignment. Calef did not pursue the matter.
On July 3,1996, Calef checked into Pembroke Hospital for depression. On July 17, after returning from hospitalization, Calef received medical clearance from the Hospital to work at Gillette “without restrictions.” [2] At his request, Gillette permitted him to work half days from July 22, 1996 through August.
Clinical notes from Dr. Soma indicate that, on August 16, 1996, Calef reported “good progress at work and in family. Sleeping well, blood pressure down, no alcohol use and no suicidal ideation.” He continued to see Dr. Soma at times, and her November 19, 1996, note indicated Ca-lef was taking Zoloft and felt it helped him with anger management. Indeed, from his return on July 22, 1996 to December 6, 1996, Calef worked without noticeable incident or infirmity.
The incident which led to the termination of Calefs employment occurred on Friday, December 6, 1996. The day before, as was customary, Gillette sought volunteers for Sunday shifts. Mechanics usually like that shift since they receive double pay. Due to scheduling needs, the company had to know by Friday who would work that Sunday. Calefs group leader, Steven Pennington (who was senior to Calef and junior to Sciarini) asked for volunteers to work that Sunday and understood Calef to have volunteered. Calefs version is that he tentatively agreed to work and said he would get back to Pennington.
*80 On Friday, December 6, management decided to run a particular production machine, thinking there was a danger of not meeting production quotas. At approximately 5:55 p.m., shortly before a meal break was scheduled to begin, Sciarini informed Pennington that the “Good News Plus” production machines would have to be run during the meal break. Pennington had short notice to find operators and mechanics who could run the machines during the break. Pennington attempted to find Calef in order to request that he delay his meal break and stay on duty while the machinés were being run. However, Pennington was unable to locate Ca-lef, so he.arranged for another mechanic, along with some machine operators, to oversee the operation of the Good News Plus machines during the break.
Calef was “disgusted” that his machines had been run during the meal break. When he returned from the break, he “went to Frank Sciarini’s office and asked why [his] machines were being run.” Pennington and Sciarini both state that Calef was upset and, despite being told why the machines had to be run during the break, Calef declared, “You know what you did to me.”
Approximately two hours before the end of Calefs shift on that same Friday night, December 6, Calef approached Pennington and informed him that he would not work the shift on the following Sunday, December 8. Pennington had already scheduled Calef to work it. Calef says Pennington became angry and yelled at him that he had to work on Sunday. Calef then walked away from Pennington, who was asking for an explanation of why Calef would not work the Sunday shift. Calef says Pennington was angry and yelling at him, “That’s it for you. We are going to get rid of you.” Pennington says Calef angrily told him “you know what you did to me,” which Pennington interpreted to be a reference to the decision to run the Good News Plus machines during Calefs meal break. Pennington continued to ask for an explanation, but Calef would not explain himself. Instead, he repeated, “You guys know what you did to me,” and walked away. To Pennington, Calef seemed irrational and increasingly erratic. Because of Calefs actions, Pennington feared for his own safety.
The two men separated. Pennington left Calef and reported the incident to Sciarini, his supervisor. Pennington told Sciarini what had happened and reported that he was afraid of Calef, that Calef was acting erratically and that Pennington could not work with him. Sciarini’s notes of the incident, which he drafted the following day, state: “On Fri. Dec. 6, 1996, at 9:30 p.m., Steve Pennington my Group Leader came to my office telling me that he cannot work with Fred Calef. I am afraid of him, he is acting crazy.”
Sciarini asked Calef to report to him, which Calef did. The two then went to a nearby office, where Sciarini asked Calef for an explanation of what happened on the production floor and what he had said to Pennington. Sciarini says he asked Ca-lef if he was still receiving counseling and taking medication and that Calef replied that, while he was still in counseling, the only medication he was taking was blood pressure pills. Calef says he was asked what drugs he was on and replied that he was taking only his blood pressure medication.
Calef says Sciarini was screaming at him, lunging over his desk at him, and telling him he was going to work on Sunday. Sciarini, for his part, observed that Calef was “barely coherent.” When Sciar-ini tried to tell him that it was wrong to walk away from a group leader, Calef repeatedly interrupted him, raised his voice *81 and talked nonsensically. Calef was making statements such as “you never tell me anything,” and was talking about how his wife was mad at him. Sciarini was very uncomfortable with Calefs behavior and he, too', began to fear for his safety. In his summary of the incident, Sciarini wrote that Calefs “behavior was out of control” at this point.
Sciarini believed that Calefs behavior might be explained by his being under the influence of illegal drugs. He requested Calef accompany him to the Medical Department, which Calef did. When Calef and Sciarini arrived, Ross, the nurse who was friendly with Calef, was on duty. Sciarini took Ross aside, explained what had happened, and requested a drug test.[3] Calef repeatedly insisted that the problem was not with him, but with his supervisors — Sciarini and Pennington — and that they, not he, should be required to take drug tests. Calef admits this and that he was speaking loudly.[4]
A few minutes later Kristin Flanagan, a registered nurse scheduled to work the shift after Ross, arrived for duty. Flanagan is a veteran of the U.S. Air Force and served on active duty in the Persian Gulf during the Persian Gulf War. Even so, Ross did not feel comfortable leaving Flanagan as the only nurse on duty while Calef was in his agitated state.
Ross called for a security guard to come to the medical department and Gillette security member Tom Lonergan came to the area. Flanagan called the Manager of Gillette’s Health Services, Joan Pember-ton, at her home, explained the situation, and requested Pemberton’s approval for a drug test.[5] Pemberton specifically recalls Flanagan saying that Calef scared her. Ross, who knew Calef, also feared for her safety at the time, and she was frightened by Calefs agitated and threatening manner. Calef appeared to her to be extremely irrational, belligerent, and sarcastic. Ross also said that Calef was extremely uncooperative, provocative, hostile, and threatening.
Sciarini, Ross, and Flanagan explained to Calef that, pursuant to company policy, he was required to take the drug test. Calef eventually agreed to do so, but only after altering his consent form to read: “Requested Group Leader Steve Pennington to take same test.” Flanagan administered the test, which later proved to be negative for illegal drugs.
Sciarini informed Calef that, because of his behavior, he was not to report to work over the weekend, and that he was to call Pemberton after 6:00 a.m. on the following Monday. Pursuant to Gillette policy, the medical staff could not let Calef drive himself home after taking the drug test. *82 Flanagan and Ross wrote a contemporaneous report of the incident, which reflects that:
[Calef] was requested to call his wife or friend to drive him home per policy. Calef said ‘the package store is closing soon and all I want to do is drive home and stop at a bar for a drink.’
Calef eventually called his wife, who picked him up.
In a summary of the incident that Sciari-ni drafted the following day, he wrote:
Later on Steve [Pennington] and I talked about the situation about Calef, Steve said that he did not yell at him. Both Steve and I feel uncomfortable working with [Calef] and for the safety of all the people working here has to be formost [sic] the greatest concern.
On the Monday following the incident, December 9, 1996, Pemberton had separate conversations with Flanagan and Ross to discuss the events involving Calef. The nurses told her their recollections of the evening and, based on those conversations and her review of the nurses’ written summary of the incident, Pemberton concluded that Calefs behavior had been completely inappropriate.
Also on Monday, Sciarini reported the events to manager Joseph Donovan. Donovan also received reports from Pem-berton and the supervisors involved. Consistent with Gillette’s regular business practice, Donovan then drafted an Employee Contact Report dated December 19, 1996. The report summarized the basis for his decision to terminate the plaintiffs employment, which was then reviewed and approved by his supervisor, Division Head John Farren. It is undisputed that Donovan made the decision to discharge Calef and that his stated reason for discharging the Plaintiff is set forth in the Contact Report. That report refers to Calefs disciplinary history, and describes the December 6 incident. The report says Calefs employment was being terminated because his behavior on that night was unacceptable; that it included insubordination and lack of cooperation with his supervisors when he refused a scheduled shift; and that Calef engaged in irrational behavior.
The report provided a synopsis of Donovan’s investigation of the incident. Donovan reported on the discussion between himself and Sciarini as follows:
Frank [Sciarini] felt Fred was out of control and that his facial expressions were irrational. Frank told me (J. Donovan) that he felt uncomfortable working with Fred because of his behavior and was concerned about the safety of his people.
Donovan attempted to contact Calef by telephone in order to inform him of his decision. When he was unable to reach Calef, he requested that the company’s personnel department send Calef a telegram, informing him of his employment termination. Western Union called Calef, who answered his phone, but refused to take the message. Accordingly, Gillette sent a copy of the termination message in the mail.
Gillette’s Change In Status Form reflecting Calefs termination from employment states that the “specific reason for [his] termination” was “unacceptable behavior.” In his Equal Employment Opportunity Commission (EEOC) charge, Ca-lef stated that he was told by Donovan and Sciarini he was being fired for irrational behavior.
Calef says that he was disoriented, unfocused, and indecisive during these events of December 6. He says he was not screaming but did speak up “a little more than calmly, with a slightly raised voice.” He admits he offended the nurses and that *83 be was “real upset” and angry. He attributes all of this to his ADHD. He says under stress his ADHD symptoms of loss of coherent speech and thinking increased. Calefs basic position on the December 6 incident is that his behavior was caused by ADHD and that the reactions the Gillette employees had to him were unreasonable and motivated by biases against people with disabilities.
After the incident he spoke to medical department personnel to apologize and asked them to speak to Donovan about his ADHD. A nurse later reported that she had done so, but Donovan’s mind was made up. Calef also called Sciarini to apologize.
In his post-Gillette employment, Calef went to work as a mechanic with the Coca-Cola Company in a job he described as being similar to the one he had held at Gillette. He did not ever inform Coca-Cola that he had ADHD. Indeed, Calef held a series of positions (many of which did not work out for reasons other than ADHD) which required him to learn particular job skills. On one job evaluation Calef was said to be “[wjilling to learn and capable of doing so.” He has been employed at Sears since April 2001, has never asked for an accommodation because of his ADHD, and testified that he learned needed skills for the job through a three-week, on-the-job training program.
II.
Taking all inferences in his favor, Calef has failed to meet his burden of creating a triable issue that he was disabled under the terms of the ADA. A disability is an “impairment that substantially limits one or more of the major life activities.” 42 U.S.C. § 12102(2). Calef has not shown such an impairment. Nor has he shown, as he must, that he was qualified to perform the essential functions of his job, either with or without reasonable accommodation. See id. at § 12111(8).
A. Substantially Limited in a Major Life Activity
Calefs argument that he was substantially limited in a major life activity rests, at its core, on evidence from Dr. Soma, his treating psychologist. Dr. Soma’s affidavit correctly recognized that the relevant disability determination turns not on the symptoms of untreated ADHD, but on Calefs ADHD when he received medication and counseling. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 483-84, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). As to that, she opined, “At the time I treated him [in the mid-1990s], Calef was still substantially limited in the major life activities of learning and speaking (the latter more severe under high stress) notwithstanding his use of Ritalin.” Nonetheless, the Supreme Court has recently required more analysis than a doctor’s conclusory opinion:
It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires [that claimants offer] evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial.
Toyota Motor Mfg., Inc. v. Williams, 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) (internal quotations and citations omitted).
It is this latter test, required by Toyota, which Calef fails. Calef claims he is substantially limited in learning and speaking.[6] We start with the easier of the *84 claimed limitations: a limitation in learning. On this record, no factfinder could rationally find such a substantial limitation on learning exists. The medical testing evidence does not support this claim. A 1998 psychometric assessment of Calef concluded:
scores of standard intelligence tests confirm clinical impressions, placing Calefs overall learning ability within the average range. No important discrepancy is seen between verbal and non-verbal abilities.
standard scholastic achievement tests show Calefs academic skills to be within the normal range for a man of his general abilities and educational level.
Calef relies on the fact that he scored “significantly below average” in a test designed to measure his resistance to distraction as tasks become increasingly more complex; he scored “significantly below the mean” on a test designed to measure his memory of complex visual organization and planning; he scored below the 25th percentile when asked to recall “a spatial task involving complex visual organization and planning”; he scored in the 16th percentile in “awareness of visual detail in the environment and visual sequencing ability”; he scored in the 2nd percentile “on a psychomotor task involving the rapid copying of figures associated with numbers”; and he scored in the 9th percentile “on a subtest requiring the solving of oral arithmetic problems.” These factors were taken into account in the conclusion that, overall, Calefs learning ability was in the average range. Further, a neurologist he consulted in 2000 reported that Calef said that Ritalin was “very effective in terms of his ability to concentrate, read, etc.” but that Calef had stopped taking it because he thought it made him depressed.
More importantly, his life experience shows no substantial limitation on learning as required by Toyota. Calef has a high school GED, has taken other courses, and has received on-the-job training where he learned new job skills. His history both before and after Gillette shows no limitation in his learning ability. These facts doom the claim. See Bercovitch v. Baldwin Sch., 133 F.3d 141, 155-56 (1st Cir.1998).
Calefs other asserted substantial limitation, in his speaking, fares no better. Both the medical assessment evidence and the evidence of his life experience render this claim meritless. A medical assessment conducted at the behest of Calefs own physicians reported that Calef “is attentive in conversation.... Language is normal.” Indeed, a comprehensive neurological assessment conducted by Peter Ro-senberger, M.D., the Director of the Learning Disorders Unit at Massachusetts General Hospital, concluded that Calefs verbal abilities were within average range, including his verbal productivity, articulation, fluency, grammar and syntax, and vocabulary. Psychometric testing performed by Dr. Rosenberger’s clinic further concluded:
Statistical analysis indicates that [Ca-lefs] verbal comprehension abilities fall within the average range (53rd le Index Score = 101).... Vocabulary development and general fund of information fall at the mean (50th le).
There is no medical evidence to contradict these conclusions.
There was no evidence that Calef could not perform the variety of speaking tasks central to most people’s lives, outside the workplace as well as within. See Toyota, 534 U.S. at 200-01, 122 S.Ct. 681. His job required him to speak with customers, su *85 pervisors, and others, and he did so satisfactorily. None of his performance evaluations note any difficulty in speaking. Further, to the extent ADHD was an impairment, a court is required to take into account the plaintiffs “ability to compensate for the impairment.” Albertson’s, Inc. v. Kirkingburg, 527 U.S. 555, 565, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999). Here, Calef compensated through Ritalin and counseling. His own testimony was that in 1996 Ritalin helped control most of the effects of ADHD while he was working: “Most all of it. I can’t think of any that it didn’t.” Nor is there any evidence of difficulty in speaking in Calefs everyday life.
At most, Calefs evidence was that, despite taking Ritalin, he still had some difficulty in concentrating at work and would blurt out or interrupt people in conversation. There is no evidence at all that he was substantially limited in speaking outside of work. This is not enough to show a speaking disability under the ADA.
To support his claim, Calef focuses on regulations promulgated by the EEOC. See 29 CFR § 1630.2(j)(l) (2002).[7] Like the Supreme Court in Toyota, we do not pass on the validity of these regulations. Even if they are valid, his claim fails. The regulations must be read in light of “the fundamental statutory requirement that only impairments causing ‘substantial limitations’ in individuals’ ability to perform major life activities constitute disabilities.” Albertson’s, 527 U.S. at 565, 119 S.Ct. 2162. Even under the EEOC regulations, Calef has not created a triable issue of fact that he is, as the regulations would require, “significantly restricted” as to the “condition, manner or duration” under which he either learns or speaks as compared to the average person in the population. A significant restriction does not mean a “mere difference.” Id. There is no evidence that Calef could not learn or speak during the activities of everyday life. At most there was evidence that sometimes — but not always or even predominantly — Calef found it difficult to handle stress. Indeed, there were undoubtedly times of stress in the fifteen months between September 15, 1995, when he was diagnosed, and December 6, 1996. But there was only one instance of uncontrolled anger reflected in the record, and that was on December 6.
Even Dr. Soma stated that while ADHD is a lifelong condition, it “may involve episodic incapacity during periods of high stress.” As to the duration and frequency of episodes of incapacity, Dr. Soma said, “Incapacity will occur infrequently and is likely to involve periods of short duration.” This statement, made in a March 1996 certificate, referred to Calefs ADHD and was part of his request for short leaves of absence — a request Gillette granted. Ca-lefs post-Gillette work history also evidences the episodic and infrequent nature of any incapacity. Calefs evidence is totally unlike the evidence presented by plaintiff in Gillen v. Fallon Ambulance Service, Inc., 283 F.3d 11 (1st Cir.2002), where we found a triable issue of disability by a one-armed ambulance attendant who had significant difficulty lifting objects. Calef, in contrast, fails the test for significant restriction as to the condition, man *86 ner, and duration for either learning or speaking.
In the end, Calefs argument devolves into a claim that ADHD makes it more difficult for him to respond to stressful situations, that when he becomes angry, he sometimes loses control and can neither speak nor think well, and that this constituted a substantial limitation on a major life activity. It is clear, though, as Dr. Soma’s affidavit indicates, that the ADHD does not cause him to become angry. The issue is how he handles his resulting stress during the episodes in which he becomes angry. This claim would not, under Toyota, qualify as a substantial limitation on a major life activity. Very few people find handling stress to be easy. Many people do not think well in stressful situations and find it harder to speak well. There was no evidence in this record that plaintiff could not perform some usual activity compared with the general population, or that he had a continuing inability to handle stress at all times, rather than only episodically. Under our caselaw, these shortcomings in the evidence are fatal. See Santiago Clemente v. Executive Airlines, Inc., 213 F.3d 25, 31-32 (1st Cir.2000) (even assuming ear impairment was a potential long-term condition, there was no evidence that it had a severe impact on plaintiffs functional ability to hear); Soileau v. Guilford, 105 F.3d 12, 15-16 (1st Cir.1997) (plaintiffs inability to get along with others is not a substantial limitation).
On different facts, ADHD might disable an individual such that the ADA applies. Calef, however, has not made the individualized showing about his particular limitations that Toyota requires. Merely pointing to a diagnosis of ADHD is inadequate.
B. Qualified Individual
Even if Calef were arguably disabled, he is not otherwise a “qualified” employee because, with or without accommodation, he could not perform an essential function of the job.[8] See 42 U.S.C. §§ 12111(8), 12112(a). Plaintiff bears the burden of showing he is qualified. Laurin v. Providence Hosp., 150 F.3d 52, 56 (1st Cir.1998).
An employer may base a decision that the employee cannot perform an essential function on an employee’s actual limitations, even when those limitations result from a disability. Leary v. Dalton, 58 F.3d 748, 753-54 (1st Cir.1995) (under Rehabilitation Act, employee with excessive absences related to claimed disability was not qualified individual); see also Mole v. Buckhorn Rubber Prods., 165 F.3d 1212, 1217 (8th Cir.1999) (plaintiff whose work had deteriorated as a result of claimed disability and resulting depression was not otherwise qualified). The statute requires that consideration “be given to the employer’s judgment as to what functions of a job are essential.” 42 U.S.C. § 12111(8). It is an essential function of. a job that a production manager be able to handle stressful situations (here, requests for overtime work and routine disagreements) without making others in the workplace feel threatened for their own safety. This function is both job-related and consistent with business necessity.
*87 Gillette has consistently disciplined employees who engage in such behavior and who are unable to handle this essential function. Before Calef knew he suffered from ADHD, Gillette applied those standards to him.[9] In 1992 he was warned about his confrontations with co-workers. In 1995 he was warned his employment would be terminated the next time he threatened an employee. Gillette has also terminated the employment of others who display similar behavior.[10]
Put simply, the ADA does not require that an employee whose unacceptable behavior threatens the safety of others be retained, even if the behavior stems from a mental disability. Such an employee is not qualified.[11] That was the point of our decision in EEOC v. Amego, Inc., 110 F.3d 135 (1st Cir.1997). It is also the view of every other circuit case which has addressed a similar situation under the ADA or the Rehabilitation Act. See Palmer v. Circuit Court, 117 F.3d 351 (7th Cir.1997); Johnson v. N.Y. Hosp., 96 F.3d 33 (2d Cir.1996) (per curiam); Williams v. Widnall, 79 F.3d 1003 (10th Cir.1996); Crawford v. Runyon, 79 F.3d 743 (8th Cir.1996); see also Bercovitch, 133 F.3d at 154-55 (plaintiff who cannot meet school disciplinary requirements is not otherwise qualified); Adams v. Alderson, 723 F.Supp. 1531, 1532 (D.D.C.1989), aff'd 1990 WL 45737 (D.C.Cir.1990) (“One who is unable to refrain from doing physical violence to the person of a supervisor, no matter how unfair he believes the supervision to be or how provocative its manner, is simply not otherwise qualified for employment.”); cf. Reed v. LePage Bakeries, Inc., 244 F.3d 254, 262 (1st Cir.2001) (“The ADA is not a license for insubordination in the workplace.”).
C. Sunday Closing Law
We have reviewed the evidence and the law on Calef s pendent claim that a termination for failure to work on Sunday violated public policy; we find the claim is without merit. There is no violation of public policy. Mass. Gen. Laws ch. 136 § 7 (2002) allows companies to be open for work on Sunday provided a permit is obtained. Gillette had obtained the permit. Calef is not free to make a violation of *88 public policy argument simply because he disagrees with the grant of the permit.
D. Conclusion
We affirm the entry of summary judgment for Gillette dismissing all claims. Costs are awarded to Gillette.

. Pemberton said she asked Calef what accommodations he would need for the ADHD. "He said that no specific accommodations were necessary and that most of his problems were focused around anger management. We agreed that if he felt a need for a 'time out’ from his work duties and needed a place to go as a result of any medical condition, Calef could come to the Medical Department.” Calef never did so.

. Calef says this information is irrelevant because the "without restrictions” referred only to depression, and not to ADHD. It is undisputed, however, that neither plaintiff nor Dr. Soma offered this clarification to Gillette or renewed their March request that his reassignment be rescinded.

. In a Drug Test Request that Sciarini signed and Gillette's Manager of Health Services approved, Sciarini checked Calefs "unusual behavior” as the reason for requiring the test. He wrote that the behavior involved “acting funny and snaping [sic] back at my group leader and repeating we tell [him] nothing whafs going on the floor.” Sciarini also wrote that "my group leader is afraid to work with Fred.”

. Sciarini’s notes of the incident, written the day after the incident, reflect that:
Fred said that Steve [Pennington] and I should take test also. The nurse [tried] to explain to him if you don’t take the drug test, the consequences could result in loss of his job. Again my opinion his behavior was out of line. He was being very irrational and insisting that Steve and I should take a drug test and then proceeded to tell nurse that I drink 2 beers a day. He was rambling and incompetent at that time.

.In filling out the necessary chain of custody forms for the drug test specimen, Flanagan noted that there was "Reasonable susp./ cause” for the drug test.

. Plaintiff's earlier claims that he was substantially limited in other major life activities *84 have been abandoned on appeal.

. That regulation reads:
(1) The term substantially limits means:
(i) Unable to perform a major life activity that the average person in the general population can perform; or
(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

. An employer has no duty to modify an essential function of a job. If the plaintiff, with or without reasonable accommodation, cannot perform an essential function of the job, then he is not a qualified individual and there is no duty to accommodate. The essential function analysis is "conceptually distinct from, though it frequently overlaps with, the undue hardship defense.” 1 H.H. Perritt, Jr., Americans With Disabilities Act Handbook, § 4.19 at 126 (3d ed.1997). The inquiry into essential functions is not intended to second-guess an employer's business judgment regarding production standards.

. As to Calef s argument that this is a “perceived to be disabled” case, there is not a whifí ol proof that the fears of the nurses and supervisor were motivated by stereotypes about the disabled. Even on plaintiff's version of the facts of that night, the reported reactions of the supervisors and nurses were entirely reasonable, and there is no evidence they were not genuine.

. Calef mistakes the role of the "direct threat” defense, which is separate from the question of whether he is otherwise qualified. In EEOC v. Amego, Inc., 110 F.3d 135, 144 (1st Cir.1997), this court rejected the argument that a court could never consider threat to others as part of the otherwise qualified analysis, but was required to view it only under the direct threat defense.

. It is questionable whether the reasonable accommodation analysis plays any role in such a case. See Palmer v. Circuit Court, 117 F.3d 351, 353 (7th Cir.1997). Calef never renewed his request to be moved to different machines. Further, he was given medical clearance to return to work without restriction in July. Finally, there is no evidence at all connecting the denial of that request, some nine months before, with the events of December 6.
Even if reasonable accommodations were pertinent, there was no reasonable accommodation which would have enabled him to perform the essential functions of his job. His uncontrollable anger was episodic and unpredictable. As the district court held, “These short leaves [are] not going to alleviate the threatening and abusive behavior because the stress arises out of the job.” Gillette had tried to accommodate Calef — it had given him time off and reduced his work schedule when requested. That did not prevent his behavior on December 6.