Filed 3/24/16  Capeci v. City of Imperial CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MICHAEL CAPECI, | D067409 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. ECU07567) |
| CITY OF IMPERIAL, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Imperial County, Juan Ulloa, Judge.  Affirmed.

Grady and Associates, Dennis M. Grady and Garrett A. Smee for Plaintiff and Appellant.

Declues, Burkett & Thompson, Jeffrey P. Thompson and Gregory A. Wille for Defendant and Respondent.

Plaintiff Michael Capeci, a former police officer of defendant City of Imperial (City), appeals from the summary judgment against him in his discrimination/failure to

accommodate case. The trial court granted City's summary judgment/adjudication motion (motion) to Capeci's operative complaint, which alleged five causes of action in violation of the Fair Employment and Housing Act (FEHA; Gov. Code,[1] § 12900 et seq.): (1) disability discrimination; (2) age discrimination; (3) race, color, national origin and/or ancestry discrimination; (4) failure to accommodate disabilities; and (5) failure to engage in the interactive process of accommodation. Capeci's operative complaint alleged a sixth cause of action for violation of the California Family Rights Act (CFRA; § 12945.2).

On appeal, Capeci contends the court erred in granting summary judgment because there were disputed material issues of fact with respect to each cause of action. As we explain, we disagree with Capeci and thus affirm the grant of summary judgment in favor of City.

---

[1] All statutory references are to the Government Code unless otherwise indicated.

A.  *Factual Overview*[2]

City hired Capeci in or about May 2008 as a full-time sworn police officer.  On April 16, 2010, Capeci suffered a serious heart attack.  City placed Capeci on medical leave from April 16 to about July 26, 2010.  Capeci consulted a cardiologist on or about July 19, 2010, who restricted Capeci to "light, sedentary desk work" on his return.  City sent Capeci to a doctor who on July 26, 2010, found Capeci was "fit for modified duty" but was to do "no heavy lifting or heavy" exercise including "running."

Capeci's light duties included working in the evidence room, where he inventoried and logged evidence among other duties; working as a "[rangemaster]," where he maintained weapons and took ammunition inventory; taking "[c]ounter reports" at the police department when a member of the public wanted to speak with a police officer;

---

[2]    As City points out in its respondent's brief, Capeci in his opening brief relied substantially on evidence that was ruled inadmissible by the trial court in connection with City's objections to Capeci's evidence in support of his opposition to the motion.  We note that with one or perhaps two exceptions, Capeci did not address those evidentiary rulings in his opening brief.  And in the one or two instances in his opening brief when he raised the issue of the evidentiary objections, he merely proclaimed such evidence "must be considered" by this court without providing any legal support or authority for his position.  Because Capeci waited until his reply brief to address *for the first time* the propriety of nearly all of the court's evidentiary rulings and because he otherwise failed to include any legal support or authority in the one or two instances when he *briefly* discussed such rulings in his opening brief, we deem his challenge to those evidentiary rulings as forfeited.  (See, e.g., *Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218, fn. 3 [noting the failure of a party to "mention the many evidentiary objections that were sustained to his supporting declarations and documents" results in a waiver of the "propriety of the trial court's evidentiary rulings"]; *City of Merced v. American Motorists Ins. Co.* (2005) 126 Cal.App.4th 1316, 1328-1329 [noting a party cannot raise new facts or claims for the first time in a reply brief].)

and conducting background investigations for potential hires, including contacting references. Capeci continued working light duty into February 2011.

Capeci's temporary light duties were not a permanent position or assignment. It was the responsibility of the records clerk to "cover and tend to the front counter" of the police department "and to manage and perform all tasks relating to the evidence room." At the time Capeci was accommodated, the records clerk position was filled by a civilian employee. Although City's police department allowed a police officer requiring *temporary* light duty accommodation to perform tasks needed by the record clerk, the department had "never used such tasks as a permanent light duty assignment for any [p]olice [o]fficer."

With respect to rangemaster, it was a special assignment for police officers in the department but was not a position in the department. Rather, the job of rangemaster was "collateral to" the job duties of a police officer and thus, "all [p]olice [o]fficers [were] expected to perform the essential job functions of patrolling and investigations, in addition to any collateral special assignments held." The special assignment of rangemaster came with a 5 percent salary increase and required on average about five hours of work each week. However, the special assignment of rangemaster had never been given on the basis of disability for "temporary" or "permanent" light duty to police officers. Capeci held the special assignment of rangemaster before his heart attack, but the department allowed him to continue after he was assigned to light duties because rangemaster "was primarily a light duty special assignment."

4

With respect to background checks, those duties were collateral to the position of captain or sergeant. When a police officer required a light duty accommodation, the department would "have the officer perform tasks needed by the [c]aptains and/or [s]ergeants regarding background investigations." However, the department had never used the task of performing background checks "as a permanent light duty assignment for any [p]olice [o]fficer."

In February 2011, City's police department consisted of between 12 or 13 sworn police officers, all of whom "were expected to do patrols and investigations." As a result of the small size of the department, it was "expect[ed] and it [was] the essential job function of all [p]olice [o]fficers to be able to perform patrols and investigations." A police officer who could not perform the essential job functions of patrolling and investigations created an "undue hardship" on the department and on the other officers who had to cover those shifts.

In early October 2010, Capeci underwent an agreed medical examination to determine whether there were permanent work restrictions. Ultimately a 23-page report was issued on January 31, 2011. The January 31 report noted Capeci was then teaching criminal justice courses at the Imperial Valley College and was working light duty at City's police department. Before his heart attack, Capeci's job duties included working patrol and responding to crimes in progress including fights and domestic disputes, among other duties.

The January 31 report noted Capeci's "[j]ob stressors" working as a police officer with the City included: "[s]mall department, used to working with a larger agency with a little more structure. [Capeci] has supervisors with fewer years of experience [than him] telling him what to do. Took a decrease in salary. It is a 20-man police department and . . . , the Chief . . . , and maybe two other officers are college educated." The January 31 report also noted Capeci's future plans were to be "promot[ed] to Administration and remain with the police department."

The January 31 report concluded that, after four months of "total temporary disability," Capeci "would have achieved maximum therapeutic benefit and become permanent and stationary"; that he nonetheless was continuing to experience shortness of breath and with history of a heart attack, "reinforced by his ejection fraction of 40 [percent] and wall motion abnormalities," he was deemed to have a 49 percent "impairment of the whole person"; and that Capeci was subject to "emotional stressors on a repetitive basis in the course of his employment." As such, the independent medical examiner concluded: Capeci "should not continue to function as a [p]olice [o]fficer where he is on the street and/or investigations. He should not be subjected to the emotional stressors of police work, as this is detrimental and has the potential to accelerate his coronary artery disease. [¶] He could function, in terms of heart trouble, at the Imperial Valley College or in some similar capacity."

On or about February 17, 2011, City notified Capeci of an "[i]nteractive [a]ccommodation [m]eeting" that would take place on February 25, 2011, to "discuss the

6

possibility of modified or alternative work taking into consideration [his] permanent work restrictions." At the February 25 meeting attended by Capeci (with his counsel appearing telephonically) and by representatives of City, the "Job Function Analysis" for a police officer was reviewed which showed field duties—including patrolling in car and on foot and pursuing and subduing suspected criminals, among other duties—was 80 percent of an officer's essential job functions. City representatives told Capeci during the meeting that after reviewing all vacant positions with City, the "only vacant position was that of [r]eserve [p]olice [o]fficer." Because Capeci could not perform the essential job functions of a police officer and because there were no alternate positions then available that were appropriate, City concluded Capeci "could not be accommodated."

City prepared an "Interactive Accommodation Assessment Summary" (assessment summary) memorializing the results of the February 25 meeting, which confirmed City could not accommodate Capeci. The assessment summary stated that the "[p]arties acknowledged that the work restrictions as outlined [in the January 31 report] would preclude Officer Capeci from returning to regular patrol and/or investigation duties." It further provided that due to the small size of the department, Capeci could not be allowed to perform his modified duties on a permanent basis, as such an accommodation would "pose a hardship" on the department. Finally, representatives of City explained that the essential functions and physical demands of the open position of reserve police officer were "essentially the same" as those of the regular police officer position. As such, the

7

assessment summary provided the "parties agreed that [the reserve officer] position would be inappropriate for Officer Capeci given the above work restrictions."

On April 6, 2011, the City Council of Imperial approved Capeci's industrial disability retirement as a result of his inability to perform the essential job functions of a police officer. On April 12, 2011, City notified Capeci that as a result of his permanent disability, he was being terminated from employment retroactive to March 25, 2011.

On July 23, 2012, an agreed medical reexamination report was issued by the same medical examiner who prepared the January 31, 2011, report. Under "chief complaints," it was noted that Capeci's "heart problems" stemming from his April 16, 2010, heart attack were "worse." (Capitalization omitted.) In taking Capeci's history, the medical examiner noted that Capeci was having "difficulty breathing" and was "afraid to go to sleep because he may not wake up"; that he was suffering "chest pain on a daily basis"; and that he was having difficulty bending and tying his shoes because of "dizziness."

The July 23 report noted that Capeci was continuing to teach criminal justice courses at Imperial Valley College, where he had taught since 2007; that he was "medically retired" in March 2011 from City's police department; and that he "has not worked full time since." Under the heading "[w]ork" in connection with his coronary artery disease, the July 23 report concluded: "[Capeci] should not function as a [p]olice [o]fficer. He cannot work the street and/or be involved with investigations. He should not be subjected to the emotional stressors of police work, as this is detrimental and has

8

the potential to accelerate his heart injury." However, the July 23 report noted that Capeci could continue to teach at Imperial Valley College.

B. *Procedural Overview*

On or about December 22, 2011, Capeci filed a charge of discrimination based *only* on disability with the Department of Fair Employment and Housing (DEFH). He filed another charge of discrimination with the DEFH on or about March 14, 2012, based on age, race, color, and/or national origin discrimination.

As noted, Capeci's operative complaint alleged six causes of action. In addition to claiming disability, age and racial discrimination, Capeci claimed he was denied an accommodation when City refused to create a new position or to allow him to continue permanently in his then current light-duty position, which he alleged City had done for another, younger officer who had failed the police academy and who was waiting for a new date to go to another academy. Capeci also claimed in his operative complaint that City failed to act in good faith in the required interactive process of accommodation in City's "haste to get rid of [him] because of his disability and/or his need for accommodation of his disability . . . ."

With respect to his race and age discrimination claims, Capeci's operative complaint alleged that he was paid $3 less than a younger, male Mexican-American officer on the force who had less experience and education than Capeci; that this same Mexican-American officer was consistently given additional collateral duties that typically went to more seasoned officers such as Capeci; and that before being hired as a

9

full-time police officer by City in about May 2008, Capeci worked as a reserve officer, where he purchased his own police uniforms only to learn that other officers (ostensibly of a different ethnicity than Capeci) hired by City for similar positions had their uniforms paid for by City "through a business account."

In granting City's motion with respect to the first cause of action for disability discrimination, the trial court found it undisputed that after Capeci suffered a heart attack, he no longer was able to perform the essential job functions of a peace officer with or without accommodation. The court further found Capeci presented no admissible evidence that (1) he could perform such essential functions; (2) City had a policy of allowing permanent light duty for peace officers; (3) there existed a light duty position for peace officers; and/or (4) he was qualified for any other position with City.

The court found there was no admissible evidence that younger officers received a higher salary than Capeci in connection with his second cause of action for age discrimination and found, in any event, that even if such evidence existed it was insufficient to establish a triable issue of fact on this claim. Regarding Capeci's third cause of action, the court similarly found there was no evidence that officers that were of different race, color, national origin and/or ancestry received a higher salary than Capeci and also found that even if such evidence existed, it was insufficient to establish a triable issue of fact on this claim.

In connection with Capeci's fourth cause of action for failure to accommodate, the court found it undisputed that City provided him with a reasonable accommodation in the

10

form of medical leave and temporary light-duty work until it was determined he was unable to return to duty because he was unable to perform the essential duties of a police officer with or without accommodation. The court also found Capeci's proffered evidence did not "seriously dispute the reasonableness of that determination."

Regarding the fifth cause of action for City's alleged failure to engage in good faith in the interactive process of an accommodation, the court found it undisputed that City engaged in the appropriate interactive accommodation meeting, there was a discussion of courses of action during that meeting, and there were no suitable positions that *then* existed that Capeci could perform. The court also found City was not required to "create a suitable position."

Finally, in connection with Capeci's sixth cause of action for medical leave retaliation, the court found it undisputed that he was not subject to adverse employment action as a result of taking medical leave and found he offered no admissible evidence to the contrary.

DISCUSSION

A. *Summary Judgment Principles*

Summary judgment/adjudication is granted when a moving party establishes the right to entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations,

11

trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)

A defendant moving for summary judgment bears the initial burden of proving that there is no merit to a cause of action by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (o)(2); *Aguilar*, *supra*, 25 Cal.4th at p. 845.) If the defendant makes such a showing, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of one or more material facts as to that cause of action or as to a defense to the cause of action. (*Aguilar*, at pp. 850-851.) If the plaintiff does not make such a showing, summary judgment in favor of the defendant is appropriate. In order to obtain a summary judgment, "all that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action . . . ." (*Id.* at p. 853.)

On appeal from the entry of summary judgment, "[w]e review the record and the determination of the trial court de novo." (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003, 1002.) "While we must liberally construe plaintiff's showing and resolve any doubts about the propriety of a summary judgment in plaintiff's favor, plaintiff's evidence remains subject to careful scrutiny. [Citation.] We can find a triable issue of material fact 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433 (*King*); see also *Sangster v. Paetkau* (1998) 68 Cal.App.4th 151,

163 (*Sangster*) ["responsive evidence that gives rise to no more than mere speculation cannot be regarded as substantial, and is insufficient to establish a triable issue of material fact"].)

In independently examining the record on appeal to determine whether triable issues of material fact exist, we " 'consider[ ] all the evidence set forth in the moving and opposition papers *except that to which objections were made and sustained*.' (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 65-66.)" (*Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519, 1530, italics added.)

In the context of discrimination claims, if an employer in connection with a summary judgment/adjudication motion " ' " 'presents admissible evidence either that one or more of plaintiff's prima facie elements is lacking, or that the adverse employment action was based on legitimate, nondiscriminatory factors, the employer will be entitled to summary judgment *unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing.* In short, by applying [the burden-shifting test set forth in] *McDonnell Douglas*[*Corp. v. Green* (1973) 411 U.S. 792 that was originally developed for use at trial] . . . , "the judge [will] determine whether the litigants have created an issue of fact to be decided by the jury." ' . . . Thus, ' "[a]lthough the burden of proof in a [discrimination] action claiming an unjustifiable [termination] ultimately rests with the plaintiff . . . , in the case of a motion for summary judgment or summary issue adjudication, *the burden rests with the moving party to negate the plaintiff's right to prevail on a particular issue. . . .* In other words, the burden

13

is reversed in the case of a summary issue adjudication or summary judgment motion. . . ." ' " ' " (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 309 (*Sandell*).)

B. *Disability Discrimination*

FEHA prohibits employment discrimination based on a physical disability. (§ 12940, subd. (a).) A prima facie case of disability discrimination includes evidence showing (1) the plaintiff suffered from a disability; (2) the plaintiff could perform the essential duties of the job with or without reasonable accommodation; and (3) the plaintiff was subjected to an adverse employment action because of the disability. (See *Sandell*, *supra*, 188 Cal.App.4th at p. 310; see also *Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 254.)

Here, it is *undisputed* that Capeci could *not* perform the essential duties of a police officer with or without accommodation, in light of his permanent disability stemming from his April 10, 2010, heart attack. Indeed, the July 23, 2012, report noted that Capeci's "heart problems" stemming from his heart attack unfortunately had become "worse" since the January 31, 2011, report that had found Capeci to have a 49 percent "impairment of the whole person." The July 23 report also noted Capeci complained of "difficulty breathing," daily chest pain, and dizziness. As a result of his coronary artery disease, the July 23 report concluded Capeci "should not function as a [p]olice [o]fficer," as he neither can "work the street and/or be involved with investigations" nor "should . . . [he] be subjected to the emotional stressors of police work, as this is

14

detrimental and has the potential to accelerate his heart injury."  In light of such evidence, we independently conclude City satisfied its initial burden to show at least one of the prima facie elements of disability discrimination cannot be established.  (See Code Civ. Proc., § 437c, subd. (o)(2); see also *Aguilar*, *supra*, 25 Cal.4th at pp. 839-840.)

Capeci contends he proffered admissible evidence to demonstrate a triable issue of material fact that he could in fact perform the essential duties of a police officer and return to full duty.  Specifically, he relies on a June 30, 2011, AME (agreed medical evaluator) supplemental report prepared by the *same* examiner who prepared the January 31, 2011, and July 23, 2012, reports.

In the June 30 supplemental report, the examiner under the section entitled "[r]ecord [r]eview" referred to an April 22, 2010, cardiology consultation prepared by the same doctor who *less* than a week earlier had performed emergency coronary angiography on Capeci after his heart attack.  In the April 22, 2010, two-page consultation note the cardiologist noted under recommendations:  "3. [Capeci] is okay to work.  He teaches at the [Imperial Valley College] and that is not physically stressful and he should be fine for that.  [¶]  4. He is told out [*sic*] to hold off on going back to police duties for the next month at least."  To show a triable issue of material fact that he actually could return to full police duty, Capeci relies on the June 30 supplemental report, which merely repeats what Capeci's cardiologist stated in the two-page April 22, 2010, consultation note.

15

Even liberally construing such evidence, as we must (see *King*, *supra*, 152 Cal.App.4th at p. 433), we independently conclude it is insufficient to allow a reasonable trier of fact to find the underlying fact in Capeci's favor. (See *ibid.*) As noted, the statements Capeci is relying on in the June 30 supplemental report were included by the examiner as relevant medical *background* information, inasmuch as the statements were from a cardiology consultation *less than a week after* Capeci's April 16, 2010, heart attack.

What's more, in our independent review of the June 30 supplemental report we discern no evidence whatsoever to support a finding the independent medical examiner was reconsidering—or even contemplating changing—his finding in his January 31, 2011 report, as later confirmed in his July 23, 2012 report, that after Capeci's heart attack he was unable to perform the essential duties of a police officer with or without accommodation and thus was unable return to full-time regular police duty. (See *Leek v. Cooper* (2011) 194 Cal.App.4th 399, 417 [noting a plaintiff must produce " '*substantial*' " responsive evidence sufficient to establish a triable issue of fact]; *Sangster*, *supra*, 68 Cal.App.4th at p. 163 [noting "responsive evidence that gives rise to no more than mere speculation cannot be regarded as substantial, and is insufficient to establish a triable issue of material fact"].) As such, we conclude the court properly granted City's motion in connection with Capeci's first cause of action for disability discrimination.[3]

_____

[3] We note in his August 21, 2014, declaration in opposition to the motion, Capeci stated he had another treadmill test "within the past three weeks" and based on that test, his doctor informed him he was healthy enough to resume police work. We note, however, this evidence was (properly) struck by the trial court on the grounds it was

16

C.  *Age Discrimination*

In order to make out a prima facie case of age discrimination under FEHA, there must be evidence that the plaintiff (1) is over the age of 40; (2) suffered an adverse employment action; (3) was performing satisfactorily at the time of the adverse action; and (4) suffered the adverse action under circumstances that give rise to an inference of unlawful discrimination.  (See *Hersant v. California Department of Social Services* (1997) 57 Cal.App.4th 997, 1002-1003 (*Hersant*).)

Here, we independently conclude there is no evidence in the record to establish a triable issue of material fact that Capeci was "satisfactorily performing " as a police officer at the time he was terminated by City, inasmuch as it was undisputed he was then unable to perform with or without accommodation the essential job functions required by that position.  (See *Hersant*, *supra*, 57 Cal.App.4th at pp. 1003, 1002.)  Indeed, as noted *ante*, at the time of his termination from City's police department an independent medical examiner had determined Capeci was unable to perform the essential job functions of a police officer because of the serious heart attack he experienced on April 16, 2010.  The examiner in his January 31, 2011, report noted that, even after four months of medical leave and even after working light duty for several additional months thereafter, Capeci "should not continue to function as a [p]olice [o]fficer" and that doing so would be

hearsay, lacked foundation and constituted inadmissible opinion evidence.  (See fn. 2, *ante*.)  In any event, evidence Capeci's heart had improved more than *two years after* he was found by an independent medical examiner to be unable to perform the essential tasks of a police officer would not allow a reasonable trier of fact to find at or near the time of his termination that he could perform such tasks with or without accommodation. (See *King*, *supra*, 152 Cal.App.4th at p. 433.)

17

"detrimental" to his health and have the "potential to accelerate his coronary artery disease."

Capeci nonetheless contends the court erred in granting City's motion as to his age discrimination cause of action because there was evidence in his declaration that City paid a younger officer with less experience than Capeci $3 more per hour and that City also reimbursed younger reserve officers for the cost of their uniforms while refusing to reimburse Capeci for the costs of his reserve uniforms.

However, we note this evidence was (properly) stricken by the trial court on the grounds of hearsay and lack of personal knowledge. (See fn. 2, *ante*.) As such, we independently conclude there is no evidence to show a triable issue of material fact that Capeci suffered an adverse employment action for purposes of his age discrimination claim. (See *Hersant*, *supra*, 57 Cal.App.4th at pp. 1002-1003.)

In addition, we separately conclude Capeci's age discrimination claim fails as a matter of law because he did not file a complaint with the DFEH within one year of the date the alleged unlawful practice occurred.[4] With some statutory exceptions not

---

4     We note the issue of the timeliness (or lack thereof) of Capeci's administrative complaint asserting age, race, color, national origin and/or ancestry discrimination was fully briefed by the parties in the trial court. Although the court did not rely on statute of limitation grounds in granting City's motion, we are not precluded from reaching this issue on de novo review, inasmuch as the parties also had an adequate opportunity to address the theory in the trial court. (See *California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22 [noting a court of review may affirm an order granting summary judgment on any correct legal theory, as long as the parties had the opportunity to address the theory below]; see also *Western Mutual Ins. Co. v. Yamamoto* (1994) 29 Cal.App.4th 1474, 1481 [noting a court of review will affirm summary judgment if it is correct on any legal ground applicable to the case, regardless of whether that ground was the legal theory adopted by the trial court].)

18

relevant here, the FEHA limitations period for filing an administrative complaint with the DFEH is one year from the date on which the alleged unlawful practice occurred. (§ 12960, subd. (d); see *Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 371 (*Nealy*).)

Here, it is *undisputed* that Capeci began his employment with City as a reserve officer in March 2008, and he held that position for three months; that Capeci was denied uniform pay only in 2008; that in July 2008, Capeci began employment at City as a full-time, sworn police officer; that his claim for denial of pay arose in July 2008, when he learned a younger officer with less experience (allegedly) received a higher rate of pay than him; that he spoke to the younger officer about this issue in 2008; that Capeci's last conversation with the chief of police about the pay issue was in 2009; that in 2009 through March 2010 (i.e., one month before his heart attack), Capeci felt he was " 'getting the run around' " from the chief of police of City and from the city manager of City about his pay increase and *then* determined they both lacked integrity and could not be trusted; and that his last conversation with the city manager regarding his pay as a police officer was in March 2010.

What's more, it also is *undisputed* that the last time Capeci raised the issue of a pay increase was at the February 25, 2011, interactive accommodation meeting; that DFEH received on December 22, 2011, Capeci's discrimination complaint based *only* on disability; and that in his December 22 complaint, Capeci specifically alleged he was discriminated against "because of [his] disability (heart trouble)," inasmuch as in April

19

2010 he had a heart attack, "[i]n July 2010 [he] was released to return to work with restrictions and assigned 'light duty,' " and in "February 2011, [he] was informed that there was no longer a position available for [him] due to [his] disability," even though he "believed [he could] continue to work with an accommodation." It was not until March 14, 2012, that Capeci filed a discrimination complaint with DFEH based on age, race, color, national origin and/or ancestry.

With respect to City's alleged failure to reimburse Capeci for the costs of his police reserve uniforms, the undisputed facts show that the alleged unlawful practice occurred at the latest in 2008, when City hired Capeci as a full-time police officer. Clearly, Capeci's filing of his age discrimination complaint with DFEH on or about March 14, 2012, was not within one year of this alleged adverse employment action by City. (See § 12960, subd. (d).)

With respect to the pay issue, it is undisputed that the last time this issue was raised was at the February 25, 2011, interactive accommodation meeting. As such, Capeci also did not file his age discrimination complaint with DFEH within one year after this alleged adverse employment action by City. (See § 12960, subd. (d).)

Capeci contends the equitable exception known as the "continuing violation doctrine" applies in his situation. Under this doctrine, an employer is liable for acts falling outside the limitations period when the acts are part of a continuing violation of the employee's FEHA rights. The employer's acts constitute a continuing violation when they "(1) [are] sufficiently similar in kind—recognizing . . . that similar kinds of unlawful

20

employer conduct, such as acts of harassment or failures to reasonably accommodate disability, may take a number of different forms [citation]; (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence."  (*Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 823.)  " '[P]ermanence' in the context of an ongoing process of accommodation of disability, or ongoing disability harassment, should properly be understood to mean the following:  that an employer's statements and actions make clear to a reasonable employee that any further efforts at informal conciliation to obtain reasonable accommodation or end harassment will be futile."  (*Ibid.*)

We independently conclude the continuing violation doctrine does not apply under the circumstances of this case.  City's alleged refusal to reimburse Capeci for the costs of his reserve uniforms and to raise his pay to equal the pay of a younger officer occurred in 2008.  Although Capeci unsuccessfully raised the issue of the pay increase in 2009 and 2010, the undisputed evidence in the record shows that in March 2010 (i.e., one month before his heart attack) Capeci felt he was "getting the run around" from the chief of police and from the city manager of City about his pay increase and *then* determined they both lacked integrity and could not be trusted.

Because the claims of adverse employment action based on the alleged denial of uniform reimbursement and equal pay are separate and independent from the claim based on disability discrimination (that was the subject of Capeci's December 22, 2011, complaint), and because City's decision not to give Capeci a pay raise acquired

21

permanence in March 2010, or at the latest by February 25, 2011, when City informed Capeci it could not accommodate him, we conclude Capeci's March 14, 2012, complaint based on age, race, color, national origin and/or ancestry discrimination was untimely. (See § 12960, subd. (d).)  For this separate reason we independently conclude the court properly granted City's motion with respect to this claim.

D.  *Race, Color, National Origin and Ancestry Discrimination*

As noted, Capeci's third cause of action alleged discrimination based on race, color, national origin and/or ancestry.  The record shows this cause of action was based on the same operative facts as Capeci's cause of action for age discrimination, inasmuch as Capeci's operative complaint alleged he suffered adverse employment action by City with respect to reimbursement of uniforms and lack of equal pay because City allegedly favored Mexican-American officers (who also were younger) over Capeci, who was Caucasian.

For the reasons discussed above in connection with his second cause of action for age discrimination, we independently conclude there is no evidence to show a triable issue of material fact that Capeci suffered an adverse employment action for purposes of his third cause of action.  (See *Hersant*, *supra*, 57 Cal.App.4th at pp. 1002-1003.)  Even if such evidence was credited, however, we further independently conclude City's motion was properly granted for the separate reason that Capeci did not file his race, color, national origin and/or ancestry discrimination complaint with DFEH within one year after he allegedly was subject to adverse employment action by City.  (See § 12960, subd. (d).)

22

E. *Failure to Accommodate*

"A reasonable accommodation is a modification or adjustment to the work environment that enables the employee to perform the essential functions of the job he or she holds or desires." (*Nealy*, *supra*, 234 Cal.App.4th at p. 373.) FEHA requires employers to make reasonable accommodation for the known disability of an employee unless doing so would produce undue hardship to the employer's operation. (§ 12940, subd. (m).) "The elements of a reasonable accommodation cause of action are (1) the employee suffered a disability, (2) the employee could perform the essential functions of the job with reasonable accommodation, and (3) the employer failed to reasonably accommodate the employee's disability." (*Nealy*, at p. 373; *Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1192 (*Wilson*).)

Here, as noted *ante*, there was no triable issue of material fact that Capeci could perform the essential functions of a police (or reserve) officer, with or without reasonable accommodation, after his April 16, 2010, heart attack. (See *Nealy*, *supra*, 234 Cal.App.4th at p. 375 [noting an "employee's case consists, in part, of showing he or she can perform the essential functions of the job with accommodation, not that an essential function can be eliminated altogether to suit his or her restrictions"], citing *Dark v. Curry County* (9th Cir. 2006) 451 F.3d 1078, 1089 [noting the Americans with Disabilities Act (ADA) "does not require an employer to exempt an employee from performing essential functions or to reallocate essential functions to other employees"]; *Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215, 1224, fn. 6 (*Raine*) [noting the FEHA, like the

ADA, "requires an employer, in the absence of undue hardship, to make 'reasonable accommodation' for an employee . . . with a known disability"].)

But that does not end our analysis.

Reasonable accommodation may also include "reassignment to a vacant position" if the employee cannot perform the essential functions of his or her position even with accommodation. (§ 12926, subd. (p)(2); Cal. Code Regs., tit. 2, §§ 11065, subd. (p)(2)(N), 11068, subd. (d)(1)(A); *Raine*, *supra*, 135 Cal.App.4th at p. 1223.) Although FEHA requires the employer to offer the employee "comparable" or "lower graded" vacant positions for which he or she is qualified (Cal. Code Regs., tit. 2, § 11068, subd. (d)(2), (1)), it neither requires a reassignment if there is no vacant position for which the employee is qualified (*Cuiellette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 767 (*Cuiellette*)), nor requires the employer to promote the employee or create a new position for the employee to a greater extent than it would create a new position for any employee, regardless of disability. (Cal. Code Regs., tit. 2, § 11068, subd. (d)(4); *Spitzer v. Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1389 (*Spitzer*) [noting the "responsibility to reassign a disabled employee who cannot be otherwise accommodated does 'not require creating a new job, moving another employee, promoting the disabled employee, or violating another employee's rights under a collective bargaining agreement' "].)

Here, the evidence is undisputed that during the relevant time period the only vacant position for which Capeci was qualified was reserve officer. However, the evidence is also undisputed that the position of reserve officer required the same essential

24

job functions as the position of full-time police officer. As such, City was relieved under FEHA of its duty to reassign Capeci. (See *Spitzer, supra,* 80 Cal.App.4th at p. 1389.)[5]

Capeci nonetheless contends the court erred in granting City's motion as to this cause of action because the light-duty assignment he performed from August 2010 to January 2011, after he returned from his medical leave of absence, "was, by definition, an accommodation, which allowed him to perform the essential functions of his position at the time, which was acting as the evidence technician, rangemaster, and performing other non-strenuous duties." He further contends that allowing "City to decide whether 'light duty' (a reasonable accommodation) is temporary or permanent allows . . . City to skirt the true purpose of the law, that is protecting those with disabilities who can perform the essential functions of their job." We disagree.

FEHA does not require an employer to convert a temporary, light-duty accommodation into a permanent position. (See *Raine*, *supra*, 135 Cal.App.4th at pp. 1223-1224.) In *Raine*, a police officer who had been on the force for 21 years injured his knee while on duty. The officer was reassigned to a temporary light-duty position at the defendant city's front desk to accommodate him while his injury healed. Six years later, the defendant was advised that the plaintiff police officer's disability was permanent

---

5 City also did not have a duty to await a vacant position to arise. A finite leave of absence may be a reasonable accommodation to allow an employee time to recover, but FEHA does not require the employer to provide an indefinite leave of absence to await possible future vacancies. (See *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 968 (*Nadaf-Rahrov*).)

and that he would never be able to perform the essential functions of a patrol officer. (*Id.* at p. 1218.)

The court in *Raine* noted the issue was "not whether Raine was qualified for the position, but whether he was entitled as a reasonable accommodation to remain at the front-desk position permanently." (*Raine*, *supra*, 135 Cal.App.4th at p. 1223.) Recognizing no California court had then addressed whether an employer was obligated under FEHA to make a temporary position available indefinitely once the employee's temporary disability became permanent, the *Raine* court relied on an opinion from the Ninth Circuit Court of Appeals—*Watkins v. Ameripride Services* (9th Cir. 2004) 375 F.3d 821, 828 (*Watkins*)—that had interpreted FEHA's accommodation requirements and analyzed the issue as follows:

"In *Watkins* an employer temporarily accommodated an injured delivery truck driver by allowing him to make special deliveries that did not involve heavy lifting. When it became clear the employee's injuries were permanent and he would not be able to perform the essential functions of a delivery truck driver, the employer sought to accommodate the employee by transferring him to another position. Unsatisfied with that accommodation, the employee filed a lawsuit alleging, in part, that FEHA required the employer to make the temporary special-delivery assignment permanent. Relying on *McCullah* [*v. Southern Cal. Gas Co.* (2000)] 82 Cal.App.4th [495,] 501 [(*McCullah*)], the Ninth Circuit held FEHA obligated the employer to transfer the employee to an existing

26

vacant position; it did not require the creation of a new position of 'special delivery driver' to accommodate the employee's disability. (*Ibid.*)

"Federal courts of appeals interpreting the ADA, upon which FEHA's accommodation requirements are modeled have similarly held not only that an employer is not required to create light-duty positions for purposes of accommodating a disabled employee unable to perform the essential functions of the position for which he or she was hired, but also that an employer who has created such a temporary assignment has no duty to transform that accommodation into a permanent position once it is informed the employee's disability has become permanent. (*Watson v. Lithonia Lighting* (7th Cir. 2002) 304 F.3d 749, 752 (*Watson*); *Hoskins v. Oakland County Sheriff's Dept.* (6th Cir. 2000) 227 F.3d 719, 730-731 (*Hoskins*); *Malabarba v. Chicago Tribune Co.* (7th Cir. 1998) 149 F.3d 690, 696 (*Malabarba*); *Aldrich v. Boeing Co.* (10th Cir. 1998) 146 F.3d 1265, 1271, fn. 5; *Laurin v. Providence Hosp.* (1st Cir. 1998) 150 F.3d 52, 60 (*Laurin*); cf. *Shiring v. Runyon* (3d Cir. 1996) 90 F.3d 827 [reasonable accommodation requirements of federal Rehabilitation Act applicable to federal employees did not require employer to make temporary light-duty position permanent for employee whose disability had become permanent].)

"In *Hoskins*, *supra*, 227 F.3d 719, a deputy sheriff whose on-the-job injury limited her ability to restrain inmates in the county jail brought suit under the ADA alleging the Oakland County (Michigan) Sheriff's Department (OCSD) had a duty to accommodate her disability by reassigning her permanently to a position in one of the control booths,

27

which did not require interaction with inmates. In its motion for summary judgment on the deputy's ADA claim for disability discrimination, the OCSD provided evidence the control booth position (for which the deputy was indisputably qualified) was reserved as a rotating position for all deputies. The OCSD argued that assigning the deputy to the temporary position on a permanent basis would undermine the rotating nature of the position and thus was an unreasonable accommodation as a matter of law. The Sixth Circuit agreed, holding the ADA did not require an employer to convert a temporary rotating position into a new, full-time position as an accommodation for an employee whose disability had become permanent: 'Hoskins'[s] request would essentially require the creation of a new position rather than reassignment to an otherwise existing vacant one. As we have made clear, an employer's duty to reassign an otherwise qualified disabled employee does not require that the employer create a new job in order to do so.' (*Id.* at p. 730.)

"Similarly, in *Watson*, *supra*, 304 F.3d 749, an assembly[-]line worker suffered a shoulder injury that restricted her ability to perform assembly[-]line work. Her employer assigned her temporarily to a series of light-duty tasks while she recovered from her injury. When informed by the worker's physician that her injury would never heal and she would never be able to perform assembly[-]line work for which she had been hired, the employer discharged the worker. The district court granted summary judgment for the employer on the worker's ADA claim, which alleged the employer had a duty to accommodate her by allowing her to remain in the light-duty position. The Seventh

Circuit affirmed, holding '[t]he ADA does not require an employer that sets aside a pool of positions for recovering employees to make those positions available indefinitely to an employee whose recovery has run its course without restoring that worker to her original healthy state.  A person is "otherwise qualified" within the meaning of the ADA only if she can perform one of the regular jobs (with or without an accommodation).  Watson [the employee] cannot perform any assembly-line job . . . .  [W]hat she wants is a different job, comprising a subset of the assembly[-]line tasks . . . .  [T]he ADA does not require employers to create new positions . . . .'  (*Id.* at p. 752.)

"The same reasoning has been utilized by every federal court of appeals that has considered the issue.  (See, e.g., *Aldrich v. Boeing Co., supra,* 146 F.3d at p. 1271, fn. 5 [employer 'not required to create positions merely to accommodate' plaintiff's disability]; *Laurin, supra,* 150 F.3d at p. 60 [ADA did not require hospital to assign nurse with epilepsy to permanent day shift even though it had done so on temporary basis to assist her recuperation]; *Malabarba, supra,* 149 F.3d at p. 696 [acknowledging the 'long-standing recognition that the ADA does not require that employers transform temporary work assignments into permanent positions.'].)  The result should be no different under the substantially identical provisions of FEHA.  (See *Spitzer*, *supra*, 80 Cal.App.4th at p. 1384 ['Resort to federal case law is particularly appropriate in connection with the duty to make reasonable accommodation because the provisions of the state regulations defining "reasonable accommodation" under the FEHA are virtually identical to language of the ADA reiterated in the regulations implementing that federal statute.  [Citations.]'].)

29

"Like the ADA, FEHA does not require the employer to create a new position to accommodate an employee, at least when the employer does not regularly offer such assistance to disabled employees. (*McCullah, supra,* 82 Cal.App.4th at p. 501; *Hastings, supra,* 110 Cal.App.4th at p. 972; *Spitzer, supra,* 80 Cal.App.4th at p. 1389; see also *Watkins, supra,* 375 F.3d at p. 828.) Yet that is exactly what Raine seeks—to make his temporary assignment (albeit a long-term temporary assignment) permanent. The evidence was undisputed the front-desk position is used by [Burbank Police Department] for officers recovering from injuries. The only persons working the front desk on a *permanent* basis are civilian police technicians, receiving less pay and fewer benefits than sworn police officers." (*Raine*, at pp. 1224-1226.)[6]

Here, we conclude *Raine* and the cases on which it relies are persuasive and inform our decision in the instant case. The evidence is undisputed that after his serious

---

[6]    See also *Furtado v. State Personnel Bd.* (2013) 212 Cal.App.4th 729, 753 [relying on *Raine* to conclude the California Department of Corrections and Rehabilitation correctly demoted the plaintiff to a nonpeace officer position because the plaintiff was unable to perform the essential job functions of a correctional lieutenant, the evidence demonstrated there was "no purely 'administrative' correctional lieutenant position" and thus, the Department of Corrections was not required to create a "new 'administrative' position" when that position did not exist]; *Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 965 [noting the defendant was not obligated to make the plaintiff police officer's temporary modified duty assignment permanent, or to convert a different administrative position into a permanent light-duty position after the plaintiff suffered a serious heart attack, because the plaintiff was assigned to the administrative position on a temporary basis only]; but see *Cuiellette, supra*, 194 Cal.App.4th at p. 769 [noting that because the trial court had found that, during the relevant time period, the Los Angeles Police Department maintained *permanent* light-duty positions that it staffed with police officers who could not perform all of the essential duties of a police officer, the relevant inquiry was "whether [the] plaintiff was able to perform the essential duties of the light-duty assignment he was given on his return to work and not whether he was able to perform all of the essential duties of a police officer in general"].)

heart attack, City assigned Capeci to a *temporary* light-duty position, where he (1) worked in the evidence room assisting the records clerk (a civilian position), (2) continued to work as rangemaster, a duty that was collateral to the duties of a full-time police officer and was not itself a permanent position in and of itself, (3) assisted at the front desk of the department, which was staffed by civilians, and (4) helped with background checks, a duty typically performed by a captain or sergeant.

The evidence is undisputed that City offered Capeci the temporary light-duty accommodation after he returned from medical leave while he was being evaluated to determine whether he would be able to perform the essential job functions of, and return to work as, a full-time police officer. Once it was determined that Capeci was unable to return to work as a full-time police officer and that there were no vacant positions at City other than reserve officer, we independently conclude City had no obligation under FEHA to convert the temporary light-duty accommodation into a permanent position. (See *Raine*, *supra*, 135 Cal.App.4th at pp. 1223-1224.)

Capeci nonetheless contends there is evidence City had in the past allegedly created at least one permanent light-duty position, community service officer, for an individual waiting to re-enroll in a police academy. However, the court (properly) sustained objections to such evidence on the grounds of hearsay and lack of personal knowledge (see fn. 2, *ante*).

In any event, even if credited we conclude such "evidence" is insufficient to create a triable issue of fact that City maintained *permanent* light-duty positions that it staffed

with police officers who could not perform all of the essential duties of a police officer. (Cf. *Cuiellette*, *supra*, 194 Cal.App.4th at pp. 762-763 [noting that the Los Angeles Police Department at the time of the defendant's disability had a " 'longstanding policy and practice of allowing sworn officers to perform "light duty" assignments' " permanently, which was shown by evidence the defendant city had accommodated " 'hundreds of disabled officers [by] placing them in [such] assignments,' " that the defendant had maintained " 'permanent "light duty" vacancies in the drug testing and fugitive warrants units for the specific purpose of accommodating disabled officers who wanted to continue to work' " and that the plaintiff had been the beneficiary of this policy until it was changed by the defendant].)  We thus conclude the trial court properly granted City's motion on Capeci's fourth cause of action for failure to accommodate.

F.  *Failure to Engage in the Interactive Process*

Section 12940, subdivision (n) makes it unlawful "[f]or an employer or other entity covered by this part to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition."  The " 'interactive process' " required by FEHA is an informal process with the employee (or his or her representative) in an attempt to identify a reasonable accommodation that will enable the employee to perform his or her job effectively.  (*Wilson*, *supra*, 169 Cal.App.4th at p. 1195.)

Following federal courts applying the ADA, our courts have "held that an employer may be held liable for failing to engage in the good faith interactive process only if a reasonable accommodation was available, and that the employee bears the burden of proof on this issue." (*Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at pp. 979-980 [reasoning that, because § 12940, subd. (n) "requires employers to engage in the interactive process 'to determine effective reasonable accommodations, *if any*,' " this language "could reasonably be construed to mean that an employer's failure to engage in the interactive process is an unlawful employment practice (i.e., gives rise to liability) only if a reasonable accommodation existed"], italics added.)

Here, as noted *ante*, there was no vacant position to accommodate Capeci (other than reserve police officer) and the accommodation he sought would have required City to create a new, *permanent* light-duty assignment as a result of his permanent disability. Because no reasonable accommodation was available, we independently conclude the court properly granted City's motion on Capeci's fifth cause of action for failure to engage in the interactive process. (See *Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at pp. 979-980.)

G. *Medical Leave Retaliation*

The CFRA, which is contained with the FEHA, " 'is intended to give employees an opportunity to take leave from work for certain personal or family medical reasons without jeopardizing job security.' " (*Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 878.) "A plaintiff can establish a prima facie case of retaliation in

33

violation of the CFRA by showing the following: (1) the defendant was a covered employer; (2) the plaintiff was eligible for CFRA leave; (3) the plaintiff exercised his or her right to take a qualifying leave; and (4) the plaintiff suffered an adverse employment action *because he or she exercised the right to take CFRA leave*." (*Rogers v. County of Los Angeles* (2011) 198 Cal.App.4th 480, 491 (*Rogers*).)

Here, City correctly points out that Capeci in his opening brief did not offer any argument or authority to show a triable issue of material fact existed with respect to his sixth cause of action for medical retaliation under the CFRA. For this reason alone, we independently conclude Capeci has abandoned this claim and thus, the court's granting of the motion was proper. (See *Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1.)

In any event, it is undisputed that Capeci took medical leave on or about April 16, 2010, immediately after suffering a serious heart attack, and that he remained on medical leave until late July 2010. In addition, it is undisputed that on his return to work, he was temporarily assigned to a light-duty assignment where he remained until February 2011, when it was determined by the independent medical examiner that Capeci could not perform the essential job functions of a police officer. As a result of that determination, City terminated Capeci effective March 25, 2011, or about *eight months* after he returned from medical leave.

In light of this undisputed evidence and the lack of evidence proffered by Capeci to show a triable issue of material fact that he suffered an adverse employment action as a

result of his taking CFRA leave, we separately conclude the trial court properly granted the motion as to this cause of action.  (See *Rogers*, *supra*, 198 Cal.App.4th at p. 491.)

## DISPOSITION

The judgment in favor of City based on the grant of summary judgment is affirmed.  City to recover its costs on appeal.

BENKE, Acting P. J.

WE CONCUR:


HUFFMAN, J.


McDONALD, J.